**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Gordon PENNELL,**
**Defendant-Appellant.**

**No. 83–1243.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 27, 1984.

Decided June 8, 1984.

Rehearing and Rehearing En Banc
Denied July 31, 1984.

Celebrezze, Senior Circuit Judge, filed dissenting opinion.

Peter J. Kelley, Ann Arbor, Mich., for defendant-appellant.

Leonard R. Gilman, U.S. Atty., Maura Corrigan, Asst. U.S. Atty. (argued), Detroit, Mich., for plaintiff-appellee.

Before ENGEL and CONTIE, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CONTIE, Circuit Judge.

Gordon Pennell, the defendant, appeals from jury convictions for one count of conspiracy to possess with intent to distribute cocaine (21 U.S.C. §§ 841(a)(1) and 846), one count of attempt to possess with intent to distribute cocaine (21 U.S.C. §§ 841(a)(1) and 846), seven counts of unlawful use of a communications facility (21 U.S.C. § 843(b)) and one count of unlawful carrying of a firearm during the commission of a felony (18 U.S.C. § 924(c)(2)). For the reasons set forth below, we affirm.

### I.

This case involves a "reverse buy" in which Pennell paid $43,000 in cash for two pounds of sham cocaine from Drug Enforcement Administration (DEA) undercover agents who were posing as narcotics suppliers. The DEA learned of Pennell from a confidential informant. This informant had sold four ounces of cocaine weekly for the defendant prior to September 1980. Pennell had "fronted" the cocaine to the informant, *i.e.*, the informant took the cocaine and paid for it from the proceeds of subsequent sales.

By September 1980, the informant had fallen $15,000 behind in his payments. Consequently, Pennell refused to front more cocaine and eventually "sold" the account receivable to a man named MacDonald. MacDonald thereby obtained the right to "collect" the debt. Fearing for his safety, the informant contacted the DEA in October 1980 with hopes of receiving enough money in exchange for his information that he would be able to pay his debt.

The DEA declined to pay for the information and insisted that the informant fully cooperate by testifying against Pennell and MacDonald. The informant refused to testify for fear of reprisal. The informant's last contact with the DEA was in December 1980.

In January 1981, the informant agreed to sell cocaine for MacDonald in order to clear his account. After this plan failed, the informant found himself $11,000 further in debt.

The informant next met Pennell in March 1981. The defendant claimed to have ceased selling cocaine and asked the informant if he had been approached by a DEA agent named Frank. The informant stated that he had not.[1] The defendant then purported to forgive the informant's debt. A general conversation ensued. During this conversation, Pennell remarked that the informant had been a "dumb a--" for dealing with MacDonald at $33,000 per pound. The informant retorted that he knew the price had been inflated but that he currently could obtain cocaine for $22,500 per pound from a Florida source. Pennell immediate-

---

1. The informant knew this agent to be Frank Catalonga. Pennell contends that Catalonga and the informant initiated a process by which he was entrapped. This claim will be considered in Part V of this opinion.

ly expressed interest in the Florida cocaine because the price was low enough to allow both he and the informant to make a profit upon resale. The defendant urged the informant to have the Florida people call Pennell's office. He promised to reduce the informant's debt by $5,000 for each pound of cocaine sold.

The informant telephoned DEA Agent Rodriquez the following day and warned the latter that Pennell was aware of Agent Frank Catalonga's true identity. The informant met with Rodriquez and Catalonga that evening. After the informant again expressed a reluctance to testify, Catalonga suggested that the former supply Pennell with the Florida telephone number of DEA Agent Pedro Valazco rather than the number of the purported Florida cocaine source. The informant agreed to this plan. Over the next week to ten days, Pennell repeatedly requested the telephone number of the Florida source. On April 16 or 17, the informant gave Pennell the number that had been supplied by Agent Catalonga.

Pennell, using the alias "Doug", called undercover Agent Velazco on April 21. The defendant offered to buy cocaine and Velazco quoted a price of $21,500 per pound. Pennell, however, demanded a sample of the cocaine before committing himself to the purchase.

Velazco then arranged for undercover Agent Wagner to meet the defendant and provide the sample. When Wagner called Pennell, a misunderstanding arose because Wagner offered to sell four pounds of cocaine whereas the defendant only wanted to purchase one pound. Pennell refused to accept Wagner's terms.

On April 29, Velazco telephoned the defendant and assured him that Wagner had been mistaken. During a subsequent conversation with Wagner, the defendant stated that he could sell at least one pound of cocaine, and possibly two pounds, immediately. Wagner agreed to meet Pennell at a local airport in order to provide the sample.

On May 8, Wagner confirmed that he would arrive at the airport the following Tuesday and indicated that he might have a package of cocaine in addition to the sample if a Kansas City buyer did not want the package.

On May 12, Agents Wagner and Fredenburg met Pennell at Mettetal Airport. As Wagner showed the defendant four one-pound packages of sham cocaine, the latter remarked that he could immediately sell one pound to a "Mr. T" who was visiting Detroit from Los Angeles. After Wagner responded that the Kansas City customer still had an option to purchase the packages, Pennell indicated that he could hold his Los Angeles customer until Wagner determined whether the Kansas City buyer would be able to purchase the cocaine.

On May 13, Wagner informed the defendant that the Kansas City buyer had been unable to complete the transaction. Pennell increased his order to two pounds. On May 14 at a Detroit airport restaurant, the defendant purchased two pounds of sham cocaine from the agents for $43,000. He was immediately apprehended. The arresting agents discovered a .38 caliber revolver concealed on his person.

The grand jury returned an eleven count indictment. The trial jury convicted the defendant on all counts, save for count six, one of the unlawful use of a communications facility counts. The district court sentenced Pennell to concurrent nine-year terms on the conspiracy and attempt counts, to concurrent one-year terms on the unlawful use of a communications facility counts and to a consecutive one-year term on the weapons count. The court also assessed fines totaling $50,000. It is from this judgment that the defendant appeals.

## II.

Pennell contends that he may not be convicted of attempt to possess with intent to distribute cocaine[2] as a matter of law because the substance he purchased from

---

2. It bears emphasis that the defendant was convicted of attempt to possess with intent to distribute rather than with possession with intent to distribute.

the undercover agents in fact was sham cocaine. The defense essentially is one of impossibility. The resolution of this question is important to the effective enforcement of the federal drug laws because the DEA has adopted a policy in "reverse buy" situations of not furnishing real narcotics. If the defendant's claim is meritorious, the government will be forced to supply real drugs in future "reverse buy" cases. *See United States v. Everett,* 700 F.2d 900, 907–08 n. 16 (3d Cir.1983).

■ We agree with the Third Circuit's thorough analysis in *Everett* and conclude that Congress intended to eliminate the impossibility defense in cases prosecuted under 21 U.S.C. §§ 841(a)(1) and 846. *See* 700 F.2d at 903–08. Thus, the purchase of a noncontrolled substance that the defendant subjectively believes to be a controlled substance can constitute an attempt to possess with intent to distribute under § 846. *See id.* at 908; *United States v. Korn,* 557 F.2d 1089, 1091 (5th Cir.1977).[3]

■ The government must, of course, prove the defendant's subjective intent to purchase (or sell) *actual* narcotics beyond a reasonable doubt. Meeting this burden of proof can be problematic if the substance involved in a given situation is a fake narcotic. In order to avoid unjust attempt convictions in these types of cases, the courts have fashioned the following evidentiary rule:

> In order for a defendant to be guilty of a criminal attempt, the objective acts performed, without any reliance on the accompanying *mens rea*, [must] mark the defendant's conduct as criminal in nature. The acts should be unique rather than so commonplace that they are engaged in by persons not in violation of the law.

*Everett,* 700 F.2d at 909; *United States v. Innella,* 690 F.2d 834, 835 (11th Cir.1982),

*cert. denied,* 460 U.S. 1071, 103 S.Ct. 1526, 75 L.Ed.2d 949 (1983); *United States v. Oviedo,* 525 F.2d 881, 885 (5th Cir.1976); *see also United States v. McDowell,* 705 F.2d 426, 428 (11th Cir.1983). In other words, the defendant's objective conduct, taken as a whole, must unequivocally corroborate the required subjective intent to purchase or sell actual narcotics. *See McDowell,* 705 F.2d at 428; *Innella,* 690 F.2d at 835.

■ In the present case, the jury clearly could have concluded beyond a reasonable doubt that Pennell intended to purchase real cocaine. Among the defendant's objective acts, we highlight two. First, Pennell insisted upon obtaining a sample so that he could attempt to ascertain the quality of the cocaine that he was purchasing. Second, the defendant paid $43,000 for two pounds of a white powdery substance resembling cocaine. No reasonable person would pay such a price for two pounds of a white powdery substance unless he believed the substance to be genuine contraband. *Cf. Korn,* 557 F.2d at 1091 ($20,000 paid for sham methaqualone tablets). We hold, therefore, that Pennell's objective acts unequivocally corroborated the necessary intent to purchase real cocaine.

The *Oviedo* case, heavily relied upon by the defendant, does not mandate a contrary result. In *Oviedo,* the defendant sold sham heroin rather than purchasing it. Under the facts of that case, the Fifth Circuit held that the government had insufficiently corroborated the defendant's subjective intent to sell a narcotic substance. The court reasoned that the defendant's act of selling was equivocal; selling a noncontrolled substance, without more, was consistent with both guilt and innocence.[4] In the present case, however, the act which the defendant claims renders his conduct

---

**3.** Likewise, the sale of a noncontrolled substance that the defendant subjectively believes to be a controlled substance can constitute an attempt to distribute under § 846.

**4.** The Fifth Circuit later emphasized that adequate corroboration is possible in cases involv-

ing sellers of fake narcotics. *See Korn,* 557 F.2d at 1091; *United States v. Hough,* 561 F.2d 594 (5th Cir.1977). The Third Circuit has reached the same conclusion. *Everett,* 700 F.2d at 908–09.

equivocal (*i.e.*, the use of sham cocaine) was performed by the government. The government's unannounced use of sham cocaine cannot possibly be "a relevant reflection of [Pennell's] underlying intent." *McDowell*, 705 F.2d at 428; *Innella*, 690 F.2d at 835; *Korn*, 557 F.2d at 1091. Accordingly, the defendant's reliance upon *Oviedo* is misplaced.

### III.

■ A second assignment of error is that the district court should have granted use immunity to defense witness Charles Massab, who invoked his fifth amendment privilege against self-incrimination when requested to testify. Although a federal district court lacks power to grant use immunity to a witness under the federal use immunity statute, *Pillsbury Co. v. Conboy*, 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983), or under the compulsory process clause of the sixth amendment, *United States v. Lenz*, 616 F.2d 960 (6th Cir.), *cert. denied*, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980), Pennell's claim arises under the due process clause of the fifth amendment.

The reported courts of appeals cases reflect that criminal defendants have used two theories in presenting this type of due process claim. One theory involves prosecutorial misconduct. Some courts of appeals have either held or strongly suggested that if a federal prosecutor grants use immunity to government witnesses but refuses to immunize defense witnesses with the deliberate intention of distorting the judicial factfinding process, then due process may have been violated. *See United States v. Frans*, 697 F.2d 188, 191 (7th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 104, 78 L.Ed.2d 107 (1983); *Government of the Virgin Islands v. Smith*, 615 F.2d 964, 968–69 (3d Cir.1980); *United States v. Klauber*, 611 F.2d 512, 517–18 (4th Cir. 1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980); *Earl v. United States*, 361 F.2d 531, 534 n. 1 (D.C.Cir. 1966), *cert. denied*, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967); *cf. United States v. Lord*, 711 F.2d 887, 891 (9th Cir. 1983) (prosecutor alleged to have intimidated defense witness into asserting fifth amendment privilege against self-incrimination). The recommended remedy in such cases has been that a court not grant use immunity to defense witnesses, but rather that the court set aside the conviction and remand the case to afford the prosecutor an opportunity to immunize both government and defense witnesses under the use immunity statute. *See Lord*, 711 F.2d at 891–92; *Smith*, 615 F.2d at 969; *Klauber*, 611 F.2d at 518. On the other hand, the Second Circuit has held that a prosecutor's decision to immunize only government witnesses does not violate due process under any circumstances. *United States v. Turkish*, 623 F.2d 769, 774 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). *But see United States v. Burns*, 684 F.2d 1066, 1077 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). This court adverted to the prosecutorial misconduct theory in the *Lenz* case, but declined either to accept or reject the theory. 616 F.2d at 963–64.

In the present case, Pennell has not asserted the prosecutorial misconduct theory on appeal. Consequently, we emphasize that the ensuing discussion of the defendant's due process claim intimates no view on the issues of: (1) whether prosecutorial misconduct in making immunity decisions can constitute a due process violation and (2) the appropriate remedy, assuming that such misconduct can be of constitutional magnitude. We expressly reserve those questions.

■ On this appeal, Pennell has relied solely upon the second theory used by defendants who seek use immunity for witnesses. This theory, which has been accepted by the Third Circuit, is that the federal courts have inherent power to immunize witnesses whose testimony is essential to an effective defense. This power is said to exist independently of the prosecutor's prerogative to grant statutory use immunity to witnesses and is to be exer-

cised in order to protect the truthfinding function of the criminal trial. *Smith*, 615 F.2d at 969–71. The rationale underlying this theory is that a criminal defendant should not be convicted because a witness, whose testimony would exonerate the defendant, has invoked the privilege against self-incrimination.

The Third Circuit acknowledged that this approach implicates the separation of powers doctrine. *Id.* at 971. The court nevertheless held that a district court may exercise inherent power to immunize a defense witness if the witness is available, if the proffered testimony is both essential and clearly exculpatory and if no strong governmental interests countervail against a grant of immunity. *Id.* at 972. The court stressed that immunity should not be afforded to witnesses whose proffered testimony is ambiguous, cumulative, not clearly exculpatory or relevant only to credibility. *Id.* Moreover, the court identified the government's possible desire to prosecute the witness who the defendant seeks to have immunized as being the most obvious interest countervailing against an immunity grant. *Id.* at 973.

The primary question that must be addressed is whether the federal courts have inherent power to immunize witnesses.[5] Despite the Third Circuit's holding to the contrary, we conclude that the federal courts do not. This court has twice stated that federal courts have no inherent power to grant immunity to witnesses who assert the privilege against self-incrimination. *See United States v. Gullett*, 713 F.2d 1203, 1209 (6th Cir.1983), *cert. denied* —— U.S. ——, 104 S.Ct. 973, 79 L.Ed.2d 211 (1984); *Lenz*, 616 F.2d at 962. Since the potential availability of witness immunity is purely of legislative origin, *Lenz*, 616 F.2d

at 962, the separation of powers doctrine compels us to hold that the district court lacked power to grant use immunity to witness Massab.

Other courts of appeals agree with this analysis. In an opinion authored by then Circuit Judge Burger, the court of appeals for the District of Columbia stated:

> What Appellant asks this Court to do is command the Executive Branch of government to exercise the statutory power of the Executive to grant immunity in order to secure relevant testimony. *This power is not inherent in the Executive and surely is not inherent in the judiciary.* In the context of criminal justice it is one of the highest forms of discretion conferred by Congress on the Executive ... *We conclude that the judicial creation of a procedure comparable to that enacted by Congress for the benefit of the Government is beyond our power.* [Emphasis supplied.]

*Earl*, 361 F.2d at 534. The Seventh Circuit has also held that approving the use of judicially-created immunity would violate the separation of powers doctrine. *See, e.g., In Re Daley*, 549 F.2d 469, 479 (7th Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977); *United States v. Smith*, 542 F.2d 711, 715 (7th Cir.1976)[6]. Thus, while the Third Circuit's desire to insure that criminal defendants will have every opportunity to present exculpatory evidence is admirable, the federal courts simply lack the power to effectuate that aim by immunizing witnesses.

Furthermore, the Second and Fifth Circuits have identified practical considerations that militate against recognizing the concept of judicially-created witness immunity. *See Turkish*, 623 F.2d at 775–79;[7]

---

**5.** The Supreme Court's opinion in *Pillsbury Co. v. Conboy* does not control this question. Although the Court remarked at one point that "no court has authority to immunize a witness" 103 S.Ct. at 616, this statement was made in the context of construing the federal use immunity statute rather than the due process clause. The Court's opinion in *United States v. Doe*, —— U.S. ——, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), did not discuss the due process issue either.

**6.** Although the Fourth Circuit avoided ruling on the separation of powers issue in *Klauber*, the court revealed its doubt that judicially-created witness immunity is tenable under the separation of powers doctrine. 611 F.2d at 517 n. 10.

**7.** We acknowledge that the Second Circuit's recent *Burns* opinion, 684 F.2d at 1077, though citing *Turkish*, can be read as adopting the Third Circuit's approach. Assuming that this

*United States v. Thevis,* 665 F.2d 616, 638–41 (5th Cir.) cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). First, although the government theoretically is free to prosecute a witness who has obtained use immunity, the government as a practical matter may encounter great difficulty in satisfying the "heavy burden" of proving that its evidence against the witness is neither directly nor indirectly traceable to the immunized testimony.[8] *See Turkish,* 623 F.2d at 775; *Thevis,* 665 F.2d at 640 & n. 26. This is particularly true where the investigation against the witness is not yet complete. In such situations, the government may have to assign a new team of prosecutors, who are totally unfamiliar with the case, to continue the investigation and to initiate any subsequent criminal proceedings. *See id.* Even this expedient would not be possible in smaller prosecutor's offices. *See Thevis,* 665 F.2d at 640 n. 26. Moreover, the government in almost all such cases would be constrained to curtail the cross-examination of the immunized witness in order to "narrow the scope of the testimony that the witness will later claim tainted his subsequent prosecution." *Turkish,* 623 F.2d at 775.

Second, assuming that the government in some cases will be unable to prove that immunized testimony will not taint a prosecution of the witness, the court in effect will have decided that the current defendant, rather than the witness, should be prosecuted. The choice of whom to prosecute rests, of course, with the government and not with the courts. *See Thevis,* 665 F.2d at 640. If the prosecution of either the current defendant or the witness must be sacrificed in order to obtain a conviction against the other, this election should be left to the government.

Third, both the *Turkish* and *Thevis* courts afforded considerable credence to the fear that judicially-created witness immunity would create opportunities for cooperative purgery among criminals. Co-defendants, for example, "could secure use immunity for each other, and each immunized witness could exonerate his co-defendant at a separate trial by falsely accepting sole responsibility for the crime, secure in the knowledge that his admission could not be used at his own trial for the substantive offense." *Turkish,* 623 F.2d at 775. Both courts were convinced that the threat of purgery prosecutions would not deter such tactics because the penalty for purgery often is significantly less severe than the penalty attaching to the substantive offense. *See id; Thevis,* 665 F.2d at 640 n. 27. Moreover, if a significant amount of purgery were to occur, then the goal of preserving the truth-finding function of the criminal trial might be impaired, rather than promoted, by granting use immunity to defense witnesses. *See Thevis,* 665 F.2d at 640. Since recognizing the concept of judicially-created witness immunity would violate the separation of powers doctrine and could result in serious practical consequences, we hold that the district court correctly refused to immunize defense witness Massab. Proponents of judicially-created witness immunity must seek relief from Congress rather than from the federal courts.

In the alternative, we hold that even if the Third Circuit's approach to this issue were correct, the content of Massab's testimony would not satisfy the *Smith* standards. According to Pennell, Massab would have testified that the confidential informant was both selling and consuming large amounts of cocaine while cooperating with the DEA, that to Massab's knowledge, Pennell's only association with the informant was to help the latter discharge his debts, and that Massab had never observed Pennell become involved in narcotics transactions.

reading is accurate, we note that *Burns* is not a reasoned rejection of *Turkish.* Thus, we remain persuaded by the arguments made in *Turkish* concerning the practical effects of approving judicially-created immunity.

**8.** The "heavy burden" rule was enunciated in *Kastigar v. United States,* 406 U.S. 441, 461–62, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972).

At trial, defense counsel argued that Massab's testimony concerning the informant's use and distribution of cocaine was relevant to the informant's credibility (Tr. Vol. I at 22). The *Smith* case clearly indicates, however, that immunity should not be granted under such circumstances. 615 F.2d at 972. Moreover, since the informant admitted during his testimony that he had sold and ingested cocaine (Tr. Vol. XI at 14–19, 93–96), this portion of Massab's testimony would have been cumulative. Furthermore, we agree with the district court that the remainder of Massab's testimony would have been marginally exculpatory at best. That Massab personally did not observe the defendant engaging in narcotics transactions with anyone does little to rebut the testimony of the informant and of the DEA agents who testified that Pennell willingly and enthusiastically attempted to purchase two pounds of cocaine with the intent to distribute it. Massab's testimony simply was not as "clearly exculpatory" as was the proffered testimony in *Smith*. Thus, even if *Smith* were correctly decided, Pennell would not satisfy the standards set forth in that case.

## IV.

Pennell further contends that the district court should have declared a mistrial after five jurors were contacted at their homes by an anonymous telephone caller. Jury deliberations began on Friday, January 28, 1983. Between 1:00 A.M. and 1:30 A.M. on Sunday, January 30, five jurors received anonymous telephone calls. Juror Larson was told, "Urness Larson, you had better find him guilty." Juror Page's daughter answered her father's telephone and was told, "tell Charles [Page] he better vote guilty." Juror Burgess was told, "Mrs. Burgess, find him guilty or you will wish you had." The caller told Juror Saveski, "is this Janet? You had better find him guilty." Finally, the caller instructed Juror Wilcox, "Ms. Wilcox, find him guilty" (Tr. Vol. XVI at 6–7). In all five instances,

the caller urged the juror to convict and then quickly hung up.[9]

On the morning of Monday, January 31, the five jurors informed their counterparts of what had happened and then notified the court. The court proceeded individually to question the five who had received calls out of the presence of the other jurors. Juror Wilcox stated that her impartiality had not been compromised and that she did not feel intimidated. She indicated that the call could have been a prank by a young person attending the school at which she taught. Juror Burgess also assured the court that her impartiality had not been affected, but indicated that Juror Saveski had exhibited apprehension and nervousness about the telephone calls. Burgess also stated that Saveski had not said "one way or the other whether the [telephone call] would have anything to do with her decision."

When asked if the telephone call would impair his ability to render a fair verdict, Juror Page responded, "I don't believe it is impaired in the least." Page did indicate, however, that Juror Saveski was "disturbed" about the matter and was "unsure" of herself. The court next questioned Saveski. During the ensuing discussion, Saveski stated four times in response to different questions that the telephone call had not affected her impartiality or her ability to decide the case on the basis of the testimony and exhibits. Finally, Juror Larson assured the court three times that she would exclude the telephone calls from consideration during deliberations.

With the concurrence of counsel for both parties, the court then summoned the entire jury and asked a series of questions designed to elicit whether any juror's impartiality had been compromised and whether any juror would find it difficult to render a verdict based upon the evidence and the court's instructions. When no juror responded, the court ordered the jury to

9. Although the government contends that the caller's statements should not be regarded as threats, similar statements were so regarded in

*United States v. Brown*, 571 F.2d 980, 987 (6th Cir.1978).

resume deliberations. Defense counsel then moved for a mistrial.

After the jury resumed deliberations, the forewoman sent a note to the court which read in its entirety:

Attention Honorable Judge Cook. We do have a juror Linda Lorenz, that does feel that the phone calls will influence her judgment in this case. Forewoman Darlene Patterson. (Tr.Vol. XVI at 36).

The court immediately summoned Juror Lorenz, who had not received a telephone call, back to the courtroom. In response to questions, Lorenz stated that listening to the other jurors had made her nervous and that she did not wish to receive a telephone call. Nevertheless, she twice indicated that the calls received by the others would not affect her verdict. In response to additional questioning, Lorenz stated three times that the calls would not affect her deliberations and further stated that she could still abide by her juror's oath. The court then asked Lorenz if she were concerned about possible safety, to which Lorenz responded by nodding her head. When asked whether her nervousness would prevent her from continuing deliberations, Lorenz responded, "I don't know." The following transpired shortly thereafter:

The Court: ... But what I need to know from you is whether you can still perform your responsibilities as a juror?

Juror Lorenz: I believe so. As long as I have something stating or somebody stating that nothing is going to become of all this. I mean ...

The Court: I have every reason to believe that nothing will. And the Court has initiated some processes on this matter. I will say nothing more than simply that.

All right. Thank you very much. We will be back with you. (Tr. Vol. XVI at 43).

After Juror Lorenz returned to the jury room, the court denied the motion for mistrial. As to Juror Lorenz, the court found:

After examining Ms. Lorenz in the presence of counsel and on the record, this Court believes that Ms. Lorenz, while nervous and apprehensive about potential harm to herself, that she is nevertheless able and willing to continue as a juror and, moreover, that I am satisfied that Ms. Lorenz, being aware of her responsibilities as a juror, will confine her assessment of the facts in this case to the testimony of the witnesses, the exhibits that have been received into evidence and the instructions that were presented to the Jury by the Court. Moreover, the last juror, Linda Lorenz, advised the Court that she could confine her evaluations to those three categories that I have just mentioned. (Tr. Vol. XVI at 48).

Regarding the jury as a whole, the court found:

It is my personal opinion, in speaking with the jurors prior to the—to this session and during the session that they were resolute in their belief that their opinion would not be swayed one way or the other by the telephone call. More specifically, I am satisfied that the jurors, in responding to my questions, were desirous of continuing in their roles as jurors and that the telephone calls would not play any part in their decision. Thus, I am satisfied that a verdict from the Jury, whether it is guilty or not guilty, will not be tainted or affected in any way by the telephone calls that were received by them on Sunday morning, between the hours of 1:00 and 1:30. (Tr. Vol. XVI at 48–49).

The court did offer the jury the opportunity to be sequestered. The jury declined this offer and deliberated for three more days without incident before rendering its verdict.

*Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), has generally been regarded as the leading case on the issue of how a district court should treat unauthorized communications with jurors. The Supreme Court in *Remmer* fashioned the following rule:

In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial

about the matter pending before the jury *is,* for obvious reasons, *deemed presumptively prejudicial,* if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. *The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.* [Emphasis supplied.]

*Id.* at 229, 74 S.Ct. at 451.

Both prior to and after *Remmer,* this court strictly applied the presumptive prejudice standard. *See Krause v. Rhodes,* 570 F.2d 563 (6th Cir.1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 517 (1978) (civil case); *United States v. Ferguson,* 486 F.2d 968 (6th Cir.1973); *Stone v. United States,* 113 F.2d 70 (6th Cir.1940). The *Stone* and *Ferguson* cases are instructive.

In *Stone* a juror was approached by a third party. The juror immediately reported the incident to the court and swore under oath that he had not told other jurors of the approach. The juror further assured the court that he would decide the case as though the incident had not occurred. The court then asked each juror, except for the one approached, if anything that might prejudice him had taken place, including discussions with third parties. Each juror responded in the negative. Despite the assurances obtained by the district court, this court reversed. Although the eleven jurors apparently never were informed of the content of the conversation between the approached juror and the outside party (unlike the present case), the court feared that the eleven would suspect that the one juror who had not been questioned had been approached. This was held to be sufficient to raise the presumption of prejudice. Moreover, the court refused to accept the jurors' assurances as proof that no juror had been prejudiced. In reference, for instance, to the approached juror, the court commented:

Jurors are human and not always conscious to what extent they are in fact biased or prejudiced and their inward sentiments cannot always be ascertained. In the present case, the juror commendably showed anxiety at the approach to him concerning the case and whether he leaned one way or the other because of the occurrence, is beyond ascertainment. 113 F.2d at 77. Taken to its logical conclusion, this statement holds that juror assurances of impartiality can never be relied upon as rebutting the presumption of prejudice because jurors are incapable of determining whether or not their impartiality has been compromised.

In *Ferguson,* a juror named Austin visited a mutual friend of the defendant and himself. The two discussed the case against the defendant for ten or twelve minutes. Austin later remarked to a fellow juror named Hampton that the government's check kiting allegations were weak. Austin used language very similar to that which had been used by his friend. Austin also made comments to a juror named Jordan. The district court excused Austin from further service. Hampton was allowed to remain after admitting that he had heard Austin's remarks but also after assuring the court that his opinion had not been influenced. Jordan denied discussing the case with Austin.

This court reversed, indicating that the presumption of prejudice, "although rebuttable, is a rigid one." 486 F.2d at 972. Two points in *Ferguson* merit emphasis. First, the presumption of prejudice was not rebutted by excusing the juror who had been approached by the outside party and who had informed two other jurors of the incident. The court appears to have thought that once other jurors become aware of an unauthorized communication, the presumption of prejudice is nearly impossible to overcome:

The district judge acted commendably in his attempts to eliminate any possible prejudice so that the trial could proceed. Unfortunately, the matter did not come to the attention of the court until after

Austin had already discussed the case with other jurors. By then it was too late.

*Id.* In the present case, of course, none of the jurors who received telephone calls were excused and the entire jury heard about the calls.

Second, the court in *Ferguson* expressed its distrust toward juror assurances of impartiality, much as it had done in *Stone:*

Although Hampton assured the court that he still had an open mind on the case, and we have no reason not to believe that he made that statement honestly, we cannot ignore the fact that jurors are human beings, subject to the same suspicions, perhaps subconsciously, as all other persons. It is not unreasonable to believe that Hampton may have had his suspicions aroused that Austin's statements to him were related to Austin's excusal from the jury and indicative of a possible attempt by defendants to influence the jury improperly.

*Id.* at 971–72. The court then stated with reference to the entire jury that "we can only speculate on whether suspicions were formed that were later carried into the deliberations." *Id.* at 972.

Were, *Remmer*, *Ferguson* and *Stone* controlling, we would be hard pressed to affirm Pennell's conviction. As has been indicated, the opinions in *Ferguson* and *Stone* found the presumption of prejudice unrebutted where a jury learned of an approach to one of its members. Moreover, both opinions clearly exhibited a distrust of juror assurances of impartiality. The Supreme Court, however, has recently filed an opinion that is relevant to the case as hand. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Thus, the question is whether *Phillips* has so changed the rules relating to unauthorized communications with jurors that the presumptive prejudice standard as applied in *Ferguson* and *Stone* no longer governs.

We conclude that *Phillips* has indeed altered the law concerning unauthorized communications with jurors.

■ Although *Phillips* involved bias resulting from a juror's potential employment relationship with a law enforcement agency, the principles set forth in the opinion apply to allegations of jury partiality generally. In essence, *Phillips* reinterpreted *Remmer*. Although the Court in *Phillips* referred to the *Remmer* presumptive prejudice standard, the Court nevertheless stated:

This court has long held that the remedy for allegations of juror partiality is a *hearing in which the defendant has the opportunity to prove actual bias.* [Emphasis supplied.]

455 U.S. at 215, 102 S.Ct. at 945. Thus, the Court held that *Remmer* does not govern the question of the burden of proof where potential jury partiality is alleged. Instead, *Remmer* only controls the question of how the district court should proceed where such allegations are made, *i.e.*, a hearing must be held during which the defendant is entitled to be heard. 455 U.S. at 216, 102 S.Ct. at 945. In light of *Phillips*, the burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality. Prejudice is not to be presumed.[10]

■ Moreover, the Court in *Phillips* implied that deference should be accorded a district court's findings made after a properly conducted hearing:

The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, *and a trial judge ever watchful to prevent prejudicial oc-*

---

**10.** Unlike the dissenting opinion, we read *Remmer* as requiring the government to do more than come forward with evidence that unauthorized communications with jurors were

harmless. As the quotation cited at 17 *supra*, indicates, *Remmer* placed a heavy burden of proof upon the government. Accordingly, *Phillips* worked a substantive change in the law.

*currences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in Remmer and held in this case.* [Emphasis supplied.]

455 U.S. at 217, 102 S.Ct. at 946. This language is consistent with the rule, adopted by several courts of appeals prior to *Phillips,* that a district court's decision not to grant a mistrial after investigating allegations of unauthorized contact with jurors should be reviewed only for abuse of discretion. *See United States v. Phillips,* 664 F.2d 971, 998–99 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Armstrong,* 654 F.2d 1328, 1332 (9th Cir. 1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 315 (1982); *United States v. Almonte,* 594 F.2d 261, 265–66 (1st Cir. 1979); *United States v. Fleming,* 594 F.2d 598, 608 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979). We hereby adopt the abuse of discretion standard of review.

Finally, in contrast with this court's opinions in *Ferguson* and *Stone,* the Supreme Court in *Phillips* stated that juror testimony at *Remmer* hearings, often the evidence upon which such hearings will turn, should not be regarded as "inherently suspect." 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7. Indeed, the Court emphasized that "one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Id.; cf.*

*United States v. Blanton,* 719 F.2d 815 (6th Cir.1983) (en banc) (juror self-evaluations during *voir dire* concerning whether pretrial publicity had resulted in opinions about guilt or innocence that could not be set aside). Even the dissent in *Phillips* recognized that juror testimony at a *Remmer* hearing involving unauthorized communications with outsiders is likely to be reliable because "a juror will be less reluctant to admit that he was disturbed or upset by the misconduct of a third party, than to admit that he himself acted improperly." 455 U.S. at 236, 102 S.Ct. at 955 (Marshall, J., dissenting). Accordingly, we hold that if a district court views juror assurances of continued impartiality to be credible, the court may rely upon such assurances in deciding whether a defendant has satisfied the burden of proving actual prejudice.[11]

Pennell would distinguish *Phillips* on the basis that the decision involved a habeas corpus petition brought pursuant to 28 U.S.C. § 2254. The majority in *Phillips* did state:

Of equal importance, this case is a federal habeas action in which Justice Birns' findings are presumptively correct under 28 U.S.C. § 2254(d).

455 U.S. at 218, 102 S.Ct. at 946. We view this statement as an independent and alternative ground upon which the Supreme Court rested its decision not to disturb the state court's finding of no juror bias.[12] Hence, we are convinced that had *Phillips* involved a direct appeal from a federal conviction, the Court would have promul-

**11.** The dissenting opinion contends that *Phillips* does not govern this case because it involved juror misconduct whereas this case involves unauthorized contacts by an anonymous third party. Juror misconduct is said to be potentially more prejudicial than third party misconduct. In some cases, juror misconduct may be so potentially prejudicial that bias must be conclusively presumed.

We agree that juror misconduct can be more prejudicial than unauthorized communications by third parties. We conclude, however, that this fact supports the result reached in this opinion. If a *Remmer* hearing at which the defendant has the burden of proving actual bias (as opposed to a hearing at which the govern-

ment bears a heavy burden of disproving prejudice) is adequate in most cases involving potentially more prejudicial juror misconduct, then *a fortiori* such a hearing should suffice where unauthorized contacts by third parties are involved. Furthermore, if juror assurances of impartiality can be reliable in juror misconduct cases where the potential for prejudice is greater, such assurances should be reliable in cases involving unauthorized communications by third parties.

**12.** The presumption of correctness does not apply, of course, to direct appeals of federal criminal convictions.

gated the same guidelines concerning the burden of proof at *Remmer* hearings and the probative value of juror testimony at such hearings.

■ Turning to the facts of this case, we hold that the district court did not abuse its discretion in refusing to grant the mistrial motion. When notified that five jurors had received threatening telephone calls, the court immediately conducted a *Remmer* hearing in order to determine whether the impartiality of the five contacted jurors had been compromised and whether the other jurors had learned of the telephone calls. The court thoroughly questioned the contacted jurors on an individual basis and concluded that their assertions of unimpaired impartiality were worthy of belief. In particular, the court closely questioned Juror Saveski, who two other jurors had described as apprehensive and nervous. In light of Saveski's repeated assertions of her continued ability to decide the case solely upon the evidence, the district court was entitled to find that she remained impartial.

The court then sought to ascertain whether the telephone calls had affected any of the other jurors. The court obviously was successful in this endeavor because Juror Lorenz informed the court through the forewoman's note that her ability to deliberate might have been impaired. Again, the court engaged in extensive questioning which revealed that although Lorenz was nervous and somewhat apprehensive about the telephone calls, this nervousness would not affect her verdict. The district judge, who was in a position to evaluate Lorenz's demeanor and attitude as she answered, was satisfied that she would remain impartial. In view of the Supreme Court's holding that jurors are well qualified to say whether or not their impartiality has been compromised, and further in view of the fact that the district court found the jurors' repeated assertions of unimpaired impartiality worthy of belief, we conclude that the district court did not abuse its discretion in holding that Pennell had not demonstrated actual prejudice.

## V.

A fourth assignment of error is that the government entrapped the defendant. Pennell contends that he also was a confidential informant for Agent Catalonga. After obtaining the information about the Florida cocaine source in March 1981, Pennell telephoned Catalonga on April 17 to inform him that he was in a position to infiltrate a narcotics distribution ring. Thus, Pennell asserts that he acted thereafter in the belief that he was working for Catalonga. Catalonga and the other informant purportedly entrapped him by giving him the telephone number of Florida DEA Agent Velazco.

■ The central inquiry in entrapment cases is whether law enforcement officials implanted a criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who was already predisposed to do so. *See, e.g., United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *United States v. Norton,* 700 F.2d 1072, 1075 (6th Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983). If a defendant raises the entrapment defense, the government bears the burden of proving predisposition beyond a reasonable doubt. *United States v. Jones,* 575 F.2d 81, 83 (6th Cir. 1978).

■ Second, in order for a claim of entrapment *as a matter of law* to succeed, the testimony and facts must be undisputed; a court may not choose between conflicting testimony or make credibility determinations. *Sherman,* 356 U.S. at 373, 78 S.Ct. at 821; *United States v. Henciar,* 568 F.2d 489, 491 (6th Cir.1977), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978). Furthermore, the undisputed evidence must demonstrate a "patently clear" absence of predisposition. *Henciar,* 568 F.2d at 491. If either of these elements is missing, then the predisposition question is for the jury to decide. Having thoroughly

reviewed the record, we conclude that Pennell's and the government's versions of the events in question were conflicting and that the government introduced a substantial quantity of evidence on the predisposition question. Since neither element necessary for a finding of entrapment as a matter of law is present, the district court properly submitted the entrapment claim to the jury.

 As has been indicated, the government's version of what transpired differs markedly from Pennell's. The defendant approached Livonia police officer Morris and Agent Catalonga on July 30 and 31, 1980 with information about narcotics trafficking that was occurring in his store. After listening to Pennell on July 31, Catalonga became convinced that Pennell himself was selling narcotics. Catalonga specifically warned the defendant that he would be prosecuted if he were involved in any illegal activity. Both the official report of the meeting (App. at 97–98) and Catalonga's testimony (Tr. Vol. X at 114) support the conclusion that this warning was given. According to the government, Pennell could not have left the July 31 meeting thinking that he was a DEA informant.[13]

The government further contends that nothing occurred between July 31, 1980 and April 17, 1981 that could have changed this impression. Indeed, when Pennell called Catalonga on the latter date, he acknowledged that he had no authority to engage in narcotics transactions on behalf of the DEA. Early in the conversation, the following exchange occurred:

> Pennell: ... Now, I have done some work that maybe I shouldn't have done. That I told you that I was going to do when I met you last summer. And I'm in a position now where I got a lot of trust, a lot of faith with a lot of people.
>
> Catalonga: Ah huh.

> Pennell: And if you really want to put something together and really take a lot of people down. We can do it.
>
> Catalonga: What kind of people?
>
> Pennell: Big! *You told me not to do it. Not to get involve* [sic] *and all the rest of that s---.* You and ah you and that ah Morris that imbecile from Lo Livonia. [Emphasis supplied.]

App. at 65. Later in the same discussion, Pennell again acknowledged that he did not have permission to commit otherwise illegal acts:

> Pennell: And I'm telling you I'm in a position right now to really really take a whole bunch of people down. I mean big suckers boy.
>
> Catalonga: And they're part of MacDonald's people.
>
> Pennell: Some of them are. I ran into another ah organization that isn't.
>
> Catalonga: All right, but you had nothing to do with these people huh.
>
> Pennell: *I've never done business with them.*
>
> Catalonga: But you've been out of the country and you've seen their stuff and.
>
> Pennell: *But I've never but I I've never been in possession of merchandise.*
>
> Catalonga: *Cause, you know that would be ah, you know that's the way I explained it before.*
>
> Pennell: *I know.* [Emphasis supplied.]

App. at 68. Nor did Agent Catalonga authorize Pennell to engage in narcotics transactions during the April 17th conversation itself. Suspecting that Pennell was attempting to establish a defense if later apprehended for drug trafficking, Catalonga stated that he would call Pennell back in approximately a week (App. at 68). Catalonga never did so (Tr. Vol. X at 110–12). Hence, the government concludes that the defendant could not have considered himself a DEA informant when he engaged in the conduct that led to his arrest.

Furthermore, the government introduced strong evidence of predisposition. The con-

---

**13.** Any status that Pennell may have had as a Livonia police department informant clearly ended on October 6, 1980 when he informed Officer Morris in rather strong language that he no longer wished to be associated with the Livonia police (App. at 91–93).

fidential informant testified, for instance, that Pennell was "fronting" him four ounces of cocaine per week during the summer of 1980. Catalonga testified that after listening to the defendant on July 31, 1980, he became convinced that Pennell was trafficking in narcotics because Pennell admitted, among other things, that he had invested $30,000 in MacDonald's drug business and had accompanied MacDonald on narcotics deliveries. Thus, the jury could have believed that the defendant had freely engaged in cocaine distribution in the past and was inclined to do likewise during the time period covered by the indictment.

Second, the record reflects that Pennell agreed with the informant to tap the Florida cocaine source well before he called Catalonga on April 17, 1981. The jury could have found this sequence of events to be evidence that Pennell's telephone call was merely an attempt to establish a defense in the event of future apprehension.

Third, some of the defendant's statements made to the undercover agents during the negotiations for the two pounds of cocaine were highly probative on the predisposition issue. Pennell told the agents, for example, that he had made over seventy airplane trips to Columbia and to the Caribbean in order to import illegal drugs into this country. Furthermore, the defendant related to the agents the details of a secret Customs Service anti-drug smuggling operation that had been in effect for less than two weeks. The defendant knew what type of aircraft that Customs was using and the flight altitudes that the Service was monitoring. Pennell also summarized measures that could be taken to evade detection, such as flying below fifty feet or above 14,500 feet, rapidly changing radio frequencies and using side-view mirrors so that government planes could not approach unseen from the rear. Taken as a whole, the government's evidence could easily have convinced the jury that Pennell was predisposed beyond a reasonable doubt

to commit the offenses with which he was charged. The defendant's entrapment argument is without merit.

## VI.

■■■■ A final contention is that the government introduced insufficient evidence to support a guilty verdict on the conspiracy count. Specifically, Pennell asserts that the government failed to prove an agreement between himself and at least one other person. The defendant correctly argues that proof of an agreement between two persons is an absolute prerequisite to obtaining a conspiracy conviction. *Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975). Proof of mere negotiations between drug traffickers will not suffice; the conspirators must actually agree to accomplish an illegal objective or accede to illegal terms that are acceptable to both. *See United States v. Melchor-Lopez,* 627 F.2d 886, 888–91 (9th Cir.1980). Moreover, proof of an agreement between a defendant and a government agent or informer will not support a conspiracy conviction. *United States v. Tombrello,* 666 F.2d 485, 490 n. 3 (11th Cir.), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982); *United States v. Martino,* 648 F.2d 367, 405 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 949, 102 S.Ct. 2006, 2007, 2020, 72 L.Ed.2d 465, 474 (1982); *United States v. Enstam,* 622 F.2d 857, 867 (5th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981), *cert. denied sub nom. Holley v. United States,* 451 U.S. 907, 101 S.Ct. 1974, 68 L.Ed.2d 294 (1981).

■■■■ The last point merits particular emphasis because the bulk of the government's evidence in this case concerned Pennell's dealings with the informant and the DEA agents. To establish an agreement between Pennell and a non-government affiliated party, the government relied primarily upon statements made by the defendant both before and after the commission of the charged crimes.[14] Before pro-

---

**14.** Pennell stood trial alone. The indictment did not name the person or persons with whom

he was alleged to have conspired.

ceeding, it must be noted that the courts have distinguished between a defendant who admits facts sufficient to establish an element of a crime after the crime has been committed and a defendant who admits similar facts before, or during the commission of, a crime. The defendant's out-of-court admission must be corroborated in the former situation, *Opper v. United States*, 348 U.S. 84, 89–91, 75 S.Ct. 158, 162–63, 99 L.Ed. 101 (1954); *Smith v. United States*, 348 U.S. 147, 154–55, 75 S.Ct. 194, 198, 99 L.Ed. 192 (1954); *United States v. Todd*, 657 F.2d 212, 216–17 (8th Cir.1981), *cert. denied*, 455 U.S. 926, 102 S.Ct. 1288, 71 L.Ed.2d 469 (1982), but need not be corroborated in the latter instance. *Warszower v. United States*, 312 U.S. 342, 347, 61 S.Ct. 603, 606, 85 L.Ed. 876 (1941) (admission before the crime); *United States v. Head*, 546 F.2d 6, 9 (2d Cir.1976), *cert. denied sub nom. Wheaton v. United States*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977) (admission during the pendency of a conspiracy); *United States v. Nichols*, 421 F.2d 570, 574 (8th Cir.1970) (admission before the crime). The rationale underlying this rule is that out-of-court admissions occurring after a crime has been completed are less reliable than similar admissions made beforehand.

The corroborating evidence standing alone need not establish every element of the charged crime. *Opper*, 348 U.S. at 92–93, 75 S.Ct. at 164; *United States v. O'Connell*, 703 F.2d 645, 648 (1st Cir.1983). An out-of-court admission is adequately corroborated if the corroborating evidence "supports the essential facts admitted sufficiently to justify a jury inference of their truth." *Id.*

 We hold that the evidence, when viewed in the light most favorable to the government, could have been accepted by a reasonable jury as adequate to support the conclusion that Pennell agreed with at least one other person to possess with intent to distribute cocaine. *See Meyers*, 646 F.2d 1142, 1143 (6th Cir.1981). First, the defendant admitted, in a May 5, 1981 telephone conversation with Agent Wagner,

that he was part of a drug distribution chain. During this conversation, Pennell indicated that he could send a pound of cocaine "down the pike" immediately and that he had one pound of the drug "down the tubes right now." When Wagner asked the defendant if he could "take a double header," *i.e.*, two pounds of cocaine, Pennell responded, "I got the green, and I got the outlets...." Since this statement was made before the completion of the criminal acts for which he was charged, the statement did not have to be corroborated.

Second, after Pennell was arrested and given the *Miranda* warnings, he made the following statement:

Look, I got to get the money or the cocaine back to my people. If I don't get the money back or the cocaine back to my people, they are going to kill me. They might even kill my family. (Tr. Vol. VI at 74).

The defendant also indicated that the "people" he referred to were from the south and were of Spanish descent.

Since this admission was made after the crimes in question were completed, corroboration was necessary. Corroboration was supplied, however, by the May 5 statement made to Agent Wagner. Moreover, the government introduced evidence that the street value of the two pounds of cocaine was between $80,000 and $125,000, that Pennell distributed drugs to Montreal and to the west coast, and that Pennell's car, at the time of the arrest, contained paraphenalia useful for "cutting" cocaine. This paraphenalia included a triple beam balance, a teaspoon, a razor blade, rubber syringes, forceps, rubber gloves, aluminum foil and seventeen plastic bags. The large amount of cocaine involved, the outlying markets in which the cocaine would be distributed and Pennell's possession of equipment useful for dividing the cocaine into smaller quantities for various distributors all support the conclusion that Pennell was not working alone. Consequently, the circumstantial evidence supports the essential fact admitted in the post-arrest statement (*i.e.*, the existence of a cocaine distri-

bution network) enough to justify an inference of the statement's truth.

Viewing the defendant's admissions and the circumstantial evidence as a whole, we hold that a reasonable jury could have concluded beyond a reasonable doubt that the defendant was a member of a cocaine distribution system. The jury reasonably could have inferred that such a system was the product of an agreement and that a member of the system such as Pennell must have agreed with others to perform acts necessary to achieve the purposes for which this system was constructed. One such act would be possession of cocaine with the intent to distribute it. Although the government did not produce a witness who could directly testify that he and Pennell entered into an agreement, direct evidence of the elements of a conspiracy is not required. *Meyers,* 646 F.2d at 1144.

One final point merits attention. Throughout this litigation, the government has contended that the defendant's references to "Mr. T" constituted evidence of an agreement. Having reviewed the record, however, we conclude that Pennell only indicated that he would be able to negotiate a deal with Mr. T in the near future. He did not state that an agreement with Mr. T was already in place. Accordingly, we have not treated the references to Mr. T as evidence of an agreement. *See Melchor-Lopez,* 627 F.2d at 888–91. Sufficient other evidence nevertheless exists to support the verdict on the conspiracy count.

### VII.

The judgment of the district court is AFFIRMED.

CELEBREZZE, Senior Circuit Judge, dissenting.

The majority holds that a presumption of prejudice should not be applied in a hearing to determine juror bias when five jurors receive late night threatening phone calls, the entire jury discusses the phone calls during deliberations, and one juror expresses privately doubts as to whether she can render an objective decision based solely on the evidence. Respectfully, I dissent.

Generally, the remedy for allegations of juror bias is a hearing to determine whether actual bias exists. *E.g., Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The rule to be applied at such a hearing has long been that unauthorized contact with a juror in a criminal case is presumptively prejudicial. This rule was set forth by the Supreme Court in 1892:

> Private communications, possibly prejudicial, between jurors and third persons ... are absolutely forbidden and invalidate the verdict *at least unless their harmlessness is made to appear.* (emphasis added).

*Mattox v. United States,* 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). The rule that any unauthorized contact with a juror during a trial is presumptively prejudicial was restated by the Supreme Court in *Remmer v. United States,* 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956). The Court in *Remmer* admonished that the government has a heavy burden in overcoming the rebuttable presumption; it must demonstrate that "such contact with the juror was *harmless* to the defendant." *Id.* at 229, 102 S.Ct. at 952; *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892).

As the majority concedes, this Circuit has "strictly applied the presumptive prejudice standard" in both criminal and civil cases. *United States v. Ferguson,* 486 F.2d 968 (6th Cir.1973); *Stone v. United States,* 113 F.2d 70 (6th Cir.1940). *See Krause v. Rhodes,* 570 F.2d 563 (6th Cir.1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 517 (1978); *Stiles v. Lawrie,* 211 F.2d 188 (6th Cir.1954). Other circuits have also applied the presumption of prejudice in *Remmer* type hearings to determine juror bias. *See Rinker v. County of Napa,* 724 F.2d 1352 (9th Cir.1983) (unauthorized communication with jury creates presumption of prejudice and government has heavy burden to demonstrate that no prejudice resulted from such communication); *United States v. Flaherty,*

668 F.2d 566 (1st Cir.1981); *Miller v. Estelle,* 677 F.2d 1080 (5th Cir.), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 494, 74 L.Ed.2d 636 (1982); *United States v. Greer,* 620 F.2d 1383 (10th Cir.1980); *United States v. Fleming,* 594 F.2d 598 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979); *United States v. Boscia,* 573 F.2d 827 (3d Cir.), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978); *United States v. Bufalino,* 576 F.2d 446 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978) (dicta). The majority disregards this overwhelming case law and holds that the Supreme Court in *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), has "reinterpreted" *Remmer.* In essence, the majority believes that *Phillips* not only departs from Supreme Court precedent, but also, overrules precedent established by this court and at least seven other federal courts of appeal.

The majority infers that the presumptive prejudice standard was altered by *Phillips* because the Supreme Court noted that the *defendant* must prove actual bias at a *Remmer* style hearing. The majority must have reasoned that *Remmer* placed the burden of proving juror prejudice on the government and, therefore, that *Phillips* shifted the burden of proof from the government to the defendant. Accordingly, the majority holds that the presumption of prejudice no longer applies. In my view, the majority misapprehends the role of the presumption in both *Remmer* and *Phillips.*

A presumption has a narrow effect:

A presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof.

10 J. Moore, *Federal Practice* Sec. 300.01 (1970). Under *Remmer,* a defendant has the burden of establishing that the unauthorized juror contact was prejudicial; the defendant is *aided* by a presumption that prejudice did arise from unauthorized juror contact. In the absence of evidence to the contrary, a presumption operates to invalidate any verdict. In contrast, if the government introduces evidence which rebuts effectively the presumption that unauthorized juror contact was prejudicial, the court would allow the case to continue to a final jury resolution. Thus, the government has the burden of going forward with evidence to rebut the presumption. *Remmer v. United States,* 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956). The Supreme Court's decision in *Phillips* it is not inconsistent with this procedure.

In *Phillips,* the issue was whether a *conclusive* presumption of prejudice should apply. The issue of a conclusive presumption, more often termed the doctrine of "implied bias," involves a different line of cases than those which address a presumption of prejudice.[1] *Phillips* is merely another case which rejects the use of a *conclusive* presumption of prejudice under circumstances which are not extreme. In less extreme cases, such as those in *Phillips* and the case at bar, a post-conviction hearing, where the defendant is aided by the

---

**1.** The presumption of prejudice doctrine is represented by *Remmer v. United States,* 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956), and its progeny. In contrast, the doctrine of implied bias is represented by cases such as *Dennis v. United States,* 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950) and *Leonard v. United States,* 378 U.S. 544, 84 S.Ct. 1696, 12 L.Ed.2d 1028 (1964) (*per curiam*).

Justice O'Connor's concurrence in *Phillips* indicates clearly that under extreme circumstances, for example when a juror actually participates in the criminal act with a defendant, a postconviction *Remmer* type hearing is inadequate to safeguard a defendant's right to a fair and impartial jury. In such extreme circumstances, juror bias may be implied conclusively without a hearing. Justice O'Connor was concerned that the majority's opinion in *Phillips* would be read as a rejection of the implied bias doctrine in all circumstances.

*Phillips* and *Remmer* represent two different doctrines. Which doctrine applies depends upon the gravity of the breach of the jury's integrity. In extreme cases, such as when a juror is involved in serious misconduct, bias is to be presumed conclusively. Under less serious circumstances, such as when a jury might be affected by the misconduct of a *third party,* a *Remmer* type hearing safeguards adequately a defendant's right to an impartial jury.

presumption of prejudice, will suffice to determine whether juror bias exists.

There is no precedent in support of the majority's conclusion that the Supreme Court has abandoned the application of the presumption of prejudice when unauthorized contacts are made with jurors.[2] Moreover, the majority has acknowledged that if *Remmer* and Sixth Circuit precedent did control this case, it would be "hard pressed to affirm the defendant's conviction." In my view, *Remmer* controls the disposition of this case.

There is no evidence in the record to suggest that the trial court applied the presumption of prejudice at the hearing to determine whether the improper jury contact was prejudicial. Because the court did not apply a presumption required by the law, the hearing was defective. In my view, the conviction should be reversed and the case remanded for a new trial.

---

2. If the Supreme Court had intended *Phillips* to overrule *Remmer* and its established progeny, it would have done so clearly. Absent a clear indication that the Supreme Court has "reinterpreted" *Remmer*, I cannot agree with the majority's assertion that the presumption of prejudice standard has been abandoned. In my view, the Supreme Court's opinion in *Phillips* does not address the dispositive issue in this case; namely, whether the court applied a presumption of prejudice at the hearing to determine whether jurors were biased by the threatening phone calls.