943 F.2d 53
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NITED STATES of America, Plaintiff-Appellee,
v.
Richard A. WAKEFIELD, Defendant-Appellant.
 No. 90-2292.
 United States Court of Appeals, Sixth Circuit.
 Aug. 27, 1991.
 
 Before KEITH, Circuit Judge, LIVELY, Senior Circuit Judge, and WEBER, District Judge.*
 PER CURIAM.
 
 
 1
 Richard Allen Wakefield ("defendant") appeals from the district court's November 1, 1990, judgment of conviction order and imposition of sentence entered pursuant to a jury verdict finding him guilty of conspiracy to possess with intent to distribute and to distribute heroin, possession with the intent to distribute heroin and attempted possession with intent to distribute heroin. For the following reasons, we AFFIRM.
 
 I.
 A.
 
 2
 The following statement of the facts is based on testimony at defendant's suppression hearing and evidence adduced at trial. Defendant had been obtaining and distributing large quantities of very high-grade heroin since 1987. This heroin was often obtained through an individual living on the west coast known to defendant as "Mr. Wee." Defendant provided information about his heroin trafficking to authorities after a search warrant executed at his home on December 22, 1989, yielded approximately an ounce of heroin of extremely high purity; various drug paraphernalia, including a sifter, a diluting agent and small plastic bags; $5000 in cash; and records indicative of drug trafficking.
 
 
 3
 After defendant was taken to the Farmington Hills police station for booking, he stated that he was willing to cooperate with the police to set up his supplier, Mr. Wee. Defendant provided additional information about his drug trafficking activities and Mr. Wee's role. Defendant also discussed the general outlines for a deal in which he would participate in setting up Mr. Wee. He would arrange for the purchase of three kilograms of pure heroin from Mr. Wee for delivery to Detroit.
 
 
 4
 In an unrelated incident which occurred before the details of this plan were finalized, Drug Enforcement Administration Task Force agents Leslie Fountain ("Agent Fountain") and Gregory Sykes ("Agent Sykes") (collectively the "agents") observed and approached defendant at Detroit's Metropolitan Airport on January 16, 1990. Agent Fountain observed defendant walk up to the Northwest Airlines first class ticket line and purchase a ticket with cash. He recognized defendant from an airport encounter two or three months earlier involving defendant and a companion. At that time, defendant had identified himself as the owner of a hair salon in Detroit named Styles D'Elegance. Agent Fountain had inquired about the shop's owner and learned that his name was Richard Wakefield. He had also learned that Wakefield had an extensive narcotics record and had used numerous aliases in the past.
 
 
 5
 Defendant carried only a small canvas travel bag and checked no luggage. He also appeared nervous, repeatedly looking over his shoulder while purchasing his ticket. Agent Fountain checked with the ticket agent and found that defendant had purchased a round trip ticket in the name of James Williams on a nonstop evening flight to Los Angeles. The agents tended to watch this flight based upon their experience with individuals engaged in drug trafficking.
 
 
 6
 At that point, Agent Fountain decided to initiate contact with defendant and informed his partner, Agent Sykes, of this intention. The agents caught up with defendant in the F Concourse. As Agent Fountain approached defendant, he asked to speak with defendant and to see his airline ticket. The agents were in civilian attire, and they showed defendant their credentials. Although the agents had guns with them, they were never drawn or otherwise displayed.
 
 
 7
 After making a comment like "why do you bother me every time I come to the airport," defendant produced his round-trip ticket in the name of Jesse Williams which was for a two-day stay. Defendant had paid $1,051 in cash for the ticket. In response to Agent Fountain's request for some picture identification, defendant stated that he did not have any. When asked whether defendant was the owner of a hair salon, defendant responded, "Yes, Styles D'Elegance." This information caused Agent Fountain to believe that the name on the airline ticket was an alias.
 
 
 8
 When defendant indicated his desire not to miss his plane, the agents explained that they were narcotics officers, they would like to accompany him to his flight and, if time permitted, conduct a search of his person and his bag. Defendant agreed to a search, provided he did not miss his flight. The agents and defendant proceeded to the gate to determine the amount of time before the flight was scheduled to depart. They were informed that the flight was scheduled to depart ten to fifteen minutes later. When defendant proceeded onto the jetway, Agent Fountain reminded him that he had consented to be searched. At that time, defendant responded, "I wish you'd just leave me alone. I don't have any narcotics."
 
 
 9
 Defendant was told he was not under arrest, he was not being accused of having narcotics, and that he was free to board the plane if he wished. However, Agent Fountain stated that he was going to retain defendant's bag long enough to permit the drug detection dog to conduct a sniff test. He estimated that the bag would be detained for about five minutes since the dog was on the premises. Defendant then said, "come on, man," walked out of the jetway and led the agents to the bathroom. When they entered the restroom, defendant handed his bag to Agent Fountain. Agent Fountain opened the bag and discovered a large amount of currency stacked and wrapped with rubber bands.[1] While Agent Fountain was searching defendant's bag, Agent Sykes observed defendant reach into his coat pockets. With one hand, he flung an additional bundle of money at Agent Fountain while, with the other hand, he dropped a small clear plastic bag[2] into the trash can by his side. At that point, defendant was placed under arrest and advised of his Miranda rights.
 
 
 10
 Defendant claimed that he was actually in the process of an undercover deal set up by Detective Patrick Monti ("Detective Monti") and that the agents had ruined the plan by causing him to miss his flight. The agents called Detective Monti and learned that defendant's story was false. When the agents relayed this information to defendant, he acknowledged to Agent Fountain that he had been travelling to Los Angeles to purchase a pound of heroin, which he intended to break down and sell to smaller street distributors in Detroit.
 
 
 11
 During the early morning hours of January 17, 1990, Agent Fountain obtained a telephonic search warrant authorizing the search of defendant's residence. The January 17, 1990, search yielded a few drug trafficking records and a small quantity of heroin.
 
 B.
 
 12
 On February 6, 1990, a federal grand jury returned a four-count indictment against defendant. Count one charged conspiracy to possess with intent to distribute and to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Counts two and three[3] charged possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). Count four[4] charged attempt to possess with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846.
 
 
 13
 Defendant insisted on representing himself despite several attempts by the district court to dissuade defendant. In response to its concern that defendant receive a fair trial, the district court appointed stand-by counsel for defendant. Defendant filed numerous motions, including several motions for suppression of evidence. On June 4 and 5, 1990, the district court held a hearing on defendant's motions to suppress. The district court denied these motions in their entirety.
 
 
 14
 A jury trial was held July 10-18, 1990. At the conclusion of the trial, the jury returned a guilty verdict on all counts. On November 1, 1990, defendant was sentenced, pursuant to the United States Sentencing Guidelines (the "Guidelines") to a term of life imprisonment.
 
 II.
 
 15
 The first issue defendant raises is whether there was sufficient evidence to establish the existence of a conspiracy in which he participated. Specifically, defendant argues that the only evidence of the conspiracy was provided by his own out-of-court, post-offense statements which were not corroborated by independent evidence. We disagree and conclude that there was sufficient independent, corroborative evidence to establish that a conspiracy existed and defendant, in fact, participated in the conspiracy to possess with the intent to distribute and to distribute heroin.
 
 
 16
 Proof of an agreement or a tacit understanding between two persons is a prerequisite to obtaining a conspiracy conviction. United States v. Pennell, 737 F.2d 521, 536-37 (6th Cir.1984) (citing Iannelli v. United States, 420 U.S. 770, 777 (1975)), cert. denied, 469 U.S. 1158 (1985). Statements sufficient to establish an element of a crime which are made by a defendant after the crime has been committed require independent corroboration. Pennell, 737 F.2d at 536-37. This rule's underlying rationale is that "out-of-court admissions occurring after a crime has been completed are less reliable than similar admissions made beforehand." Id. at 537. Every element of the charged crime need not be established solely by the corroborating evidence. Id. "An out-of-court admission is adequately corroborated if the corroborating evidence 'supports the essential facts admitted sufficiently to justify a jury inference of their truth.' " Id. (citing Opper v. United States, 348 U.S. 84, 92-93 (1954)). "[C]ircumstantial evidence alone can sustain a guilty verdict and ... to do so, circumstantial evidence need not remove every reasonable hypothesis except that of guilt." United States v. Stone, 748 F.2d 361, 362 (6th Cir.1984) (emphasis in original). When viewing the evidence in the light most favorable to the government, we hold that a reasonable jury could have accepted the evidence as adequate to support the conclusion that defendant agreed with at least one other person to possess with the intent to distribute heroin. See id.
 
 
 17
 After his arrest on December 22, 1989, and after consulting with his attorney, defendant indicated to Detective Monti that he wished to cooperate with the authorities. On December 26, 1989, defendant came to the Farmington Hills police station and agreed to assist in the capture of his supplier, whom defendant identified as Mr. Wee, by arranging for the delivery of three kilograms of heroin into the Detroit area.
 
 
 18
 On January 2, 1990, defendant again voluntarily appeared at the police station to be debriefed about his heroin connections and his major supplier, Mr. Wee. Defendant described Mr. Wee and stated that Anthony Moses ("Moses") had introduced defendant to Mr. Wee. Defendant elaborated on various transactions and confirmed a transaction in which he had obtained eight ounces of heroin from Mr. Wee through Moses for $5,000 per ounce. Defendant subsequently sold the eight ounces of heroin for $8,000 per ounce and received a profit of $24,000. Defendant acknowledged that, between 1987 and the end of 1989, he and Mr. Wee had conducted approximately fifteen to twenty drug sales, each involving two to three kilograms of heroin. Defendant now claims that these statements were not supported by corroborating evidence.
 
 
 19
 We find defendant's claim lacks merit and identify the following corroborative evidence adduced at trial. The defendant had identified the phone number of his west coast supplier. A personal address book seized from defendant's home during the December 22, 1989, search contained the number that corresponded with that of his supplier. Telephone bills from defendant's salon for April/May and September/October 1988 showed that five calls were made to this telephone number in San Francisco. Defendant's niece took a phone message at defendant's salon on January 5, 1990, from a person who identified himself as Mr. Wee, stating that he "could not wait. Will contact you when I return at the end of the month." The nationality and physical description of Mr. Wee that defendant gave to FBI Special Agent James Walter matched the description given by DEA Special Agent Joseph Rotter ("Agent Rotter"), who had investigated and interviewed Mr. Wee, also known as Vira Kulkovit, in connection with heroin importation into Pittsburgh. Agent Rotter also identified Moses as an individual connected with the Pittsburgh heroin organization that Mr. Wee was supplying. A pen register placed on Mr. Wee's telephone indicated that calls were made from that phone to defendant's salon.
 
 
 20
 In addition, numerous items were seized from defendant's home during the December 22, 1989, search. They included: drug paraphernalia indicative of distribution; such as a strainer, grinder, small plastic bags containing various amounts of high-purity heroin; Mannitol, a diluting agent; and $5000 in cash. Expert testimony established that the extremely high purity heroin in defendant's possession was indicative of a dealer who occupied a position near the top of the distribution chain.
 
 
 21
 From 1988 until his arrest on January 16, 1990, defendant made several trips to the west coast,[5] travelling under the name of James Williams and using a Northwest Worldperks frequent flyer card. Defendant's arrest occurred at Metro Airport after defendant, carrying seven grams of high-grade heroin and $128,000 in cash, purchased a round-trip ticket to Los Angeles for more than $1,000 in cash.
 
 
 22
 In sum, logical inferences from the purity and quantity of the heroin in defendant's possession along with the large amounts of cash taken from his home and his person permitted the jury to reasonably infer that defendant was a high-level distributor in a chain conspiracy. The telephone records, personal address book, telephone message and pen register corroborated defendant's admission that he procured his heroin from Mr. Wee. Agent Rotter's testimony verified the existence and description of Mr. Wee as well as Moses' connection with Mr. Wee's heroin distribution organization. Viewing all of the evidence in the light most favorable to the government, Jackson v. Virginia, 443 U.S. 307, 319 (1979), we hold that defendant's conspiracy conviction was supported by substantial evidence.
 
 
 23
 Defendant next raises a new[6] challenge to the validity of the garbage sweeps conducted at his residence on December 14 and 21, 1989. He claims that evidence from these sweeps which formed the basis for the state search warrant executed at his home on December 22, 1989, should have been suppressed. The basis for defendant's claim is a belatedly-discovered local ordinance which he argues created an expectation of privacy in his garbage. Thus defendant concludes that the sweeps were improper and all evidence stemming from them should have been suppressed as tainted.
 
 
 24
 We do not reach the merits of this issue because it is not properly before this court. The district court addressed whether the search of defendant's garbage was motivated by racial animus. It did not address the question of whether the Farmington Hills ordinance created a legitimate expectation of privacy for defendant. "It is a well-established principle of appellate review that appellate courts do not address claims not properly presented below." Chandler v. Jones, 813 F.2d 773, 777 (6th Cir.1987). In the instant case, this principle is applicable and precludes defendant from raising this issue for the first time on appeal.[7]
 
 
 25
 In his final argument, defendant contends that his conviction on counts three and four must be reversed because those charges are based on evidence illegally obtained during the January 16, 1990, airport stop and the January 17, 1990, search of his home[8] pursuant to a telephonic search warrant. The district court held a suppression hearing on June 4 and 5, 1989. After the suppression hearing, the district judge made factual findings and legal conclusions.
 
 
 26
 The district court found the agents' testimony credible and ruled that defendant was subjected to a Terry stop.[9] Joint Appendix at 83. The district court then contradicted itself and stated that defendant knew he was free to leave but "he decided it was in his best interest to cooperate with the officers. It's one thing to truly believe you can't leave and it's quite another to recognize the seriousness of your situation and decide what it will be best for you to do under the circumstances." The district court also ruled that defendant voluntarily consented to the search. We apply the clearly erroneous standard of review to the district court's factual findings on suppression issues. United States v. Garcia, 866 F.2d 147, 151 (6th Cir.1989).
 
 
 27
 The government argues that contrary to the district court's legal conclusion that defendant was subjected to a Terry stop, the district judge's factual findings are consistent with the alternate legal conclusion that the encounter was voluntary and consensual. Defendant granted the agents consent to search his person and his bag provided he would not miss his flight. When he was reminded that he had consented, defendant stated, "I wish you'd just leave me alone, I don't have any narcotics." At this point, the agents stated that defendant's bag would be retained just long enough to submit it to a sniff test. He then led the agents to the bathroom and submitted to the search of his person and his bag. Applying a de novo standard of review to the district court's legal conclusion that defendant was subjected to a Terry stop, we hold that the entire airport encounter between the agents and defendant prior to the moment when he was placed under arrest was voluntary and consensual, thereby triggering no fourth amendment implications. See United States v. Flowers, 909 F.2d 145, 147-48 (6th Cir.1990) (per curiam) ("If one of the questions asked, as was the case here, is 'may we search your luggage or person,' and the answer is a voluntary and uncoerced 'yes,' then the initial questioning still has not become a seizure for fourth amendment purposes.").
 
 
 28
 A defendant is seized for fourth amendment purposes "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). Applying an objective test, we must determine whether "the officer's words and actions would have conveyed ... to a reasonable person" that the defendant was being ordered to restrict his or her movement. California v. Hodari D., 59 U.S.L.W. 4335 (U.S. Apr. 23, 1991).
 
 
 29
 The prerequisites for an unlawful seizure are not present in the instant case. The testimony credited by the district court supports the conclusion that a reasonable person would have felt free to board the flight and depart for Los Angeles. Defendant's ticket and identification were retained merely to examine them and then immediately returned. The agents explicitly told defendant that he was not under arrest and was free to board the plane without submitting to a search of his person or a prolonged detention of his bag. The defendant and the agents remained in the public areas of the airport at all times. The officers were not in uniform, their guns were not drawn, nor did they make any threats or apply any coercion.
 
 
 30
 The fact that Agent Fountain indicated his intention to subject defendant's carry-on bag to a sniff test by a drug detection dog does not alter our conclusion that defendant was not seized. Defendant's consent was conditioned upon his ability to catch his flight. Agent Fountain confirmed that a sniff test would not take more than five minutes and the flight was scheduled to depart in ten to fifteen minutes. The facts in the instant case do not present the concerns expressed in United States v. Place, 462 U.S. 696, 707 (1983) (holding that a sniff test is not a search within the meaning of the fourth amendment), of indefinite detention of defendant's bag or disruption of his plans to catch his flight. Finding that the airport encounter did not even rise to the level of a Terry stop,[10] we affirm the district court's decision on the issue of whether defendant was unlawfully seized and searched on the basis of a different legal conclusion than that stated by the district court.
 
 
 31
 We also conclude that, based on the totality of the circumstances, Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973), defendant voluntarily consented to the search of his carry-on bag. Agents Fountain and Sykes testified that defendant beckoned the officers to follow him to the men's restroom after they informed him that a drug detection dog would be summoned to sniff his carry-on bag. Shortly thereafter, defendant dropped a small plastic bag containing heroin in a nearby trash receptacle. Agent Sykes retrieved the heroin. The district court concluded that defendant had voluntarily consented to the search of his bag in an attempt to cooperate with their investigation. We agree and find that the facts support the district court's holding. Thus we conclude that the district court's denial of the motion to suppress was proper.
 
 III.
 
 32
 For the foregoing reasons, we AFFIRM the judgment of conviction and sentence entered by the Honorable Barbara K. Hackett, United States District Judge for the Eastern District of Michigan.
 
 
 
 *
 The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio
 
 
 [1]
 It was later determined that defendant possessed $128,000 in cash
 
 
 [2]
 Chemical analysis revealed that the bag contained seven grams of 84% pure heroin
 
 
 [3]
 Count three of the indictment specifically charged defendant with possession with intent to distribute approximately 11 grams of heroin, seized from the defendant at the airport on January 16, 1990
 
 
 [4]
 This charge was based upon the seizure of $128,000 from defendant at the airport on January 16, which defendant subsequently admitted was to be used for the purchase of a large quantity of heroin from his supplier in California
 
 
 [5]
 This travel occurred despite the fact that defendant was on parole and forbidden to leave the state during this period
 
 
 [6]
 Defendant raised the issue of the Farmington Hills ordinance in an untimely post-trial pleading which he denominated as an amended motion for mistrial. The district court did not rule on this motion because it found that it lacked jurisdiction because of the dictates of timeliness under Fed.R.Crim.P. 33. Thus the Farmington Hills ordinance was not considered by the district court
 Defendant filed four pretrial motions to suppress evidence. One of these motions specifically challenged the admissibility of evidence derived from the December 22, 1989, execution of the state search warrant which utilized evidence from garbage sweeps to establish probable cause. Defendant sought suppression on the ground that the garbage sweeps violated his fifth amendment equal protection rights because he was discriminatorily singled out for the sweeps because he is black. Citing California v. Greenwood, 486 U.S. 35 (1988), in his pleading, defendant explicitly "acknowledge[d] that the [f]ourth [a]mendment does not grant any 'expectation of privacy in ... garbage.' " The district court denied this motion following a two-day suppression hearing.
 Defendant has abandoned his original ground for suppression on appeal and seeks review of this novel issue.
 
 
 [7]
 The fact that defendant chose to represent himself at trial does not require us to deviate from this rule. Defendant had the assistance of appointed stand-by counsel throughout the proceedings below. Counsel could have assisted defendant in researching this issue. Defendant filed numerous suppression motions in advance of trial, seeking to exclude all physical evidence including that obtained as a result of the garbage sweeps. Thus he was aware of the significance of these sweeps
 Furthermore, were this claim properly before us, we would find that defendant's argument fails because Section 14-2(b) of the Farmington Hills Code provides the following:
 It shall be unlawful for any person, other than ... city employees or a private collector to tamper or meddle with any garbage container or bundle or remove the contents thereof from the location where the same has been properly placed pending collection.
 This section specifically exempts city employees such as Farmington Hills police officers from the ordinance's prohibitions.
 
 
 [8]
 The only contraband obtained in the January 17 search of defendant's home was a small amount of heroin residue which is not charged in the indictment
 
 
 [9]
 Terry v. Ohio, 392 U.S. 1 (1968)
 
 
 [10]
 Were we to decide this case applying the Terry analysis, we would conclude that Agent Fountain had sufficient articulable suspicion to justify the stop, brief questioning, and eventual search of defendant and his bag. The following factors support this conclusion. Defendant arrived at the ticket counter shortly before the flight's departure time. The airplane ticket was purchased using cash. Defendant checked no luggage and exhibited nervous behavior. He was travelling on a non-stop flight to a city considered by law enforcement officers to be a source city. He was travelling on a flight which, based on the agents' experience, was frequently used by drug traffickers
 At the time when Agent Fountain decided to submit the carry-on bag to a sniff test, the following additional factors had been developed to support his decision. Defendant was using an alias. The airline ticket price was more than $1,000. Defendant planned a brief stay at the destination and he appeared to have grown more apprehensive.
 While each of these factors, when viewed in isolation, is consistent with innocent travel, they amounted to a reasonable suspicion of illegal drug activity when viewed as a whole. See United States v. Sokolow, 490 U.S. 1 (1989). Thus, notwithstanding our holding that the airport encounter was voluntary and consensual, we conclude that the same encounter is also sustainable as a Terry-type seizure supported by reasonable, articulable suspicion.