7 F.3d 235
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alex M. CUNNINGHAM, Defendant-Appellant.
 Nos. 92-3101, 92-3102.
 United States Court of Appeals, Sixth Circuit.
 Sept. 15, 1993.
 
 On Appeal from the United States District Court for the Southern District of Ohio, No. 90-00078; George C. Smith, J.
 S.D.Ohio
 AFFIRMED.
 Before: MILBURN and NORRIS, Circuit Judges; and WISEMAN, District Judge.*
 PER CURIAM.
 
 
 1
 Defendant, Alex M. Cunningham, appeals his conviction and life sentence for conspiracy to distribute over five kilograms of cocaine, eleven counts of money laundering, possession with intent to distribute thirty kilograms of cocaine, tax evasion, and four firearms counts.
 
 I.
 
 2
 Defendant was at the center of a wide-ranging conspiracy to import cocaine from other states and distribute it in Columbus, Ohio, during the late 1980s and early 1990s. At trial, witnesses testified that he and his associates regularly bought and sold kilograms of cocaine. Defendant was arrested several times when Columbus police officers witnessed him selling cocaine on the city's streets, or for other suspicious activity. Each time he was arrested, he had large amounts of cash in his possession, and on several occasions officers found cocaine and weapons on his person or in his car.
 
 
 3
 By 1990, the Federal Bureau of Investigation ("FBI") became involved in the investigation of defendant. On April 13, 1990, an FBI confidential informant, referred to at trial only as "Poochie," told defendant that he had a Colombian friend who was willing to meet with defendant in Washington, D.C. that night to discuss selling a large amount of cocaine. The Columbian was really FBI Special Agent Richard Garcia.
 
 
 4
 Defendant and his associate, Sabrina Terrell, agreed to fly in Poochie's airplane to Washington. On the way to the airport, Terrell purchased a gun for defendant. Poochie, defendant, and Terrell then flew to Dulles International Airport, where they met Garcia. After some negotiation, defendant agreed to purchase thirty kilograms of cocaine from Garcia for around $500,000.
 
 
 5
 In the early morning hours of April 14, all four flew to Columbus. While in the air, defendant called his girlfriend and coconspirator, Kathy Carter, to tell her he "had something up" and to ask her to meet him with his Jeep at a house they shared. At the Columbus airport, Garcia, Poochie, and Terrell waited while defendant went home to get the cash. Defendant drove his Mercedes to meet Carter, and they traded cars and both drove to the airport. The exchange took place there and then defendant and Terrell drove away with the cocaine. Although agents fired shots in an attempt to stop them, the pair escaped. As defendant drove, he asked Terrell to throw one duffel bag of cocaine out the window. Defendant was finally apprehended in Atlanta in August 1990.
 
 
 6
 Meanwhile, in April 1990, a federal grand jury returned a twenty-eight count indictment charging defendant and eight others with conspiracy to distribute more than five kilograms of cocaine, money laundering, possession with intent to distribute cocaine, tax evasion, and weapons charges. After the cases against defendant's coconspirators were either dismissed or resolved by guilty pleas, defendant was tried and a jury found him guilty on eighteen counts. He was sentenced to life imprisonment and a $2,000,000 fine.
 
 II.
 A. Conspiracy with Government Agents
 
 7
 Defendant first asserts that the cocaine conspiracy charged in Count 1 ended with the arrest of his major supplier and a close associate in February 1990. Defendant's only agreement on April 13-14, 1990, was with Poochie and Garcia, he argues, and "a conspiracy cannot be proven by an agreement between a defendant and a government agent." United States v. Barger, 931 F.2d 359, 369 (6th Cir.1991) Therefore, defendant asserts that the government was precluded from introducing evidence of the April 13-14 transaction.
 
 
 8
 There was substantial evidence that the conspiracy continued through April 13-14, 1990, with persons not associated with the government. For example, Sabrina Terrell purchased a gun for defendant on April 13 and accompanied him to Washington D.C. and back. Although she did not take part in the negotiations, she did carry the weapon for defendant. Cf. United States v. Morrow, 977 F.2d 222, 230-31 (6th Cir.1992) (en banc) (defendant guilty of aiding and abetting the carrying of a firearm because he knew his coconspirator was carrying the gun and intended it to be used for protection during drug trafficking), cert. denied, 113 S.Ct. 2969 (1993). Moreover, as the two escaped from agents at the Columbus airport, Terrell assisted defendant by helping to throw one of the bags of cocaine out the window. In addition, when asked to help because something was "up," Kathy Carter traded cars with defendant. Accordingly, the conspiracy continued through April 1990, and the court did not err in admitting testimony of the events of April 13-14.
 
 
 9
 B. Disclosure of Cunningham's Presentence Report
 
 
 10
 Defendant next contends that the district court violated Fed.R.Crim.P. 32(c)(3)(A)[1] by failing to ensure that he had an opportunity to review his presentence report ("PSR") prior to sentencing. This court has stated that the district courts "need only somehow determine that defendant and counsel have had an opportunity to read and discuss the [PSR]." United States v. Stevens, 851 F.2d 140, 143 (6th Cir.1988). Defense counsel answered the court's question as to whether he had read the PSR ambiguously, but the answer shows that defense counsel had received and reviewed at least the initial PSR. In addition, counsel expressly acknowledged that he and his client were prepared to proceed. Finally, defendant's counsel displayed his familiarity with the PSR by discussing in detail his objections to various paragraphs. Consequently, the court did not violate Rule 32.
 
 
 11
 C. Amount of Drugs Attributable to Cunningham
 
 
 12
 Defendant asserts that the district court erred in calculating the amount of cocaine attributable to him to determine his base offense level. The PSR recommended that the court attribute 59-63 kilograms of cocaine to Cunningham. The district court agreed with this figure, and, after a careful review, we find ample evidence in the trial transcript to support this calculation.
 
 D. Use of "Stale" Convictions in Sentencing
 
 13
 Although the court did not depart upward from the guidelines, it did sentence defendant to life imprisonment, which represents the high end of his sentencing range. This sentence was supported by defendant's extensive criminal history, some of which occurred more than ten years before commencement of the current offense, and would therefore be inappropriate to consider in determining criminal history category under U.S.S.G. § 4A1.2(e(2). Defendant argues that the court therefore improperly considered "stale" convictions (those older than ten years) in calculating his sentence.
 
 
 14
 This argument is precluded by U.S.G.G. § 1B1.4, which provides: "In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." Defendant's convictions older than ten years were legitimate factors for the court to consider in selecting a sentence at the high end of his sentencing range.
 
 
 15
 E. Insufficient Evidence on § 924(c) Charge
 
 
 16
 Defendant next asserts that there was insufficient evidence to support his conviction for carrying a firearm during and in relation to a drug trafficking crime under 18 U.S.C. § 924(c)(1).[2] The indictment charged defendant and Terrell with possessing a Browning .380 caliber semi-automatic pistol in relation to their possession with intent to distribute thirty kilograms of cocaine on April 14, 1990.
 
 
 17
 There was abundant evidence to support the relationship of the gun to the April 13-14 cocaine transaction. Sabrina Terrell bought the pistol at defendant's direction on April 13 and carried it with her when she and defendant met Garcia. Later, agents discovered the pistol in the abandoned Jeep, along with the remaining fifteen kilograms of cocaine that Terrell had not managed to throw out the window. It is apparent that defendant brought the pistol along and kept it handy in case the deal went sour, and to protect both the cash and the cocaine. This argument is therefore without merit.
 
 F. Defense Counsel's Conflict of Interest
 
 18
 Defendant insists that the court should have granted a mistrial, as requested, when the parties discovered on the first day of trial that one of his attorneys was working under a conflict of interest.
 
 
 19
 Within a day after the jury was impaneled, the government attorney informed the court that defendant's local counsel, Richard Cline, had an ongoing attorney-client relationship with a car dealership whose employee was to testify against defendant on the money laundering counts. The court held a hearing in chambers to discuss the issue, and the parties agreed that there was at least a potential conflict of interest. Cunningham's lead counsel, Anthony Gonzales, however, noted that "the contact between the client and [Cline] really has been limited." Gonzales conceded he saw no disadvantage to defendant if Cline were simply to withdraw from the case.
 
 
 20
 After talking to defendant, Gonzales moved for a mistrial. The judge denied the motion, finding there would be no prejudice to defendant from Cline's withdrawal.
 
 
 21
 On appeal, defendant argues that Cline's conflict of interest violated his Sixth Amendment right to effective assistance of counsel. While it is true that actual conflicts of interest are presumed to be prejudicial to a defendant's case, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " Strickland v. Washington, 466 U.S. 668, 692 (1984) (quoting Cuyler v. Sullivan, 446 U.S. 335, 350, 348 (1980)). Defendant does not allege that Cline "actively represented conflicting interests." Indeed, when the potential conflict was discovered, Cline was withdrawn as counsel. Nor does defendant contend that Cline's apparent conflict adversely affected Cline's limited work on the case or Gonzales' representation.
 
 
 22
 In any case, Cline was only acting as standby counsel and had done limited work on the case. The withdrawal took place early--on only the first day of a trial that took over a month. Under these circumstances, defendant's Sixth Amendment rights were not violated.
 
 G. Edited Tape
 
 23
 Throughout the April 13-14 meeting with defendant, Special Agent Garcia wore a concealed recording device. Defendant claims that the district court erred in admitting an edited copy of the resulting recording. The decision to admit tape recordings into evidence rests with the sound discretion of the district court. United States v. Robinson, 763 F.2d 778, 781 (6th Cir.1985).
 
 
 24
 Before the tapes were introduced into evidence, the case agent, Charles Tosi, pared the tapes down from two hours to fifty minutes because a substantial portion of the tapes contained no conversation, unintelligible conversation, or airport noises. However, Tosi did not delete any conversation from the tape.
 
 
 25
 Tosi also prepared a transcript, and Agent Garcia testified that the transcript was accurate based upon his recollection of the events of April 13-14. Over defense counsel's objection, the government was then permitted to play the tape.
 
 
 26
 On the next day of trial, the Assistant United States Attorney informed the court that during the playing of the tape, he and Tosi had realized that only the first of the two tapes had been transcribed. The court admitted the transcript of the second tape after Garcia testified as to its accuracy.
 
 
 27
 Defendant argues that because Garcia was incorrect when he testified originally that the incomplete transcript accurately represented his conversation with defendant, "we do not know if there was other information which may have been left out, possibly because of its exculpatory nature." This argument is unpersuasive because defendant would know if something was left out of the edited tapes or transcripts. His trial counsel received a copy of the unedited tapes and was free to compare the edited and unedited versions. His appellate counsel points to nothing in the transcripts or the edited tapes that misrepresents the original.
 
 
 28
 Although this court has not dealt with the question of edited recordings, other courts have upheld their introduction. See e.g., United States v. Panzardi-Lespier, 918 F.2d 313, 318 (1st Cir.1990) (tapes filtered to eliminate background noises); United States v. Carter, 613 F.2d 256, 261-62 (10th Cir.1979) (because parts of tape were inaudible, trial judge admitted only portions of tape), cert. denied, 449 U.S. 822 (1980). The district court's decision to admit the edited tapes was not an abuse of discretion.
 
 
 29
 H. Discovery of Presentence Reports of Government Witnesses
 
 
 30
 Prior to the testimony of three of defendant's coconspirators, who had previously pleaded guilty and been sentenced, defense counsel asked the court to disclose the witnesses' presentence reports because they might contain information that would impugn the witnesses' credibility or tend to exculpate defendant under Brady v. Maryland, 373 U.S. 83 (1963). The government attorney stated that after sentencing, the probation department had collected the PSRs, so that they were no longer in the government's possession.
 
 
 31
 The court agreed to look at the PSRs after each witness testified to determine whether there were any discrepancies that might reflect upon the witnesses' credibility. After that review, the judge explained that the PSRs contained no exculpatory statements or inconsistencies. The court therefore denied defense counsel's discovery request. This review was adequate to satisfy any obligation the court had to ensure the defense had access to exculpatory evidence contained in the PSRs, especially since the documents apparently were no longer in the government's control. See Brady, 373 U.S. at 87 (prohibiting suppression by the prosecution of evidence favorable to the accused).
 
 I. Severance
 
 32
 Defendant's assertion that his case should have been severed from that of his codefendant, Mondell Robinson, is meritless. There could be no possible prejudice to defendant from any antagonistic defense by Robinson on the money laundering count that named them both because that count was dismissed against both defendants during trial. Defendant does not argue that Robinson's counsel did anything to prejudice his defense on any other count. Accordingly, the district court's decision not to sever the cases was not an abuse of discretion.
 
 
 33
 J. Government Witness' Answering Ultimate Question
 
 
 34
 Defendant maintains that his request for a mistrial should have been granted when the government asked what he considers to be an ultimate question on his guilt. On questioning by the government, Agent Garcia testified that in his capacity as an undercover agent, he had come into contact with a number of drug dealers. The prosecutor then asked, "[D]id [defendant] appear to you, based on your experience and training, to be a drug dealer?"
 
 
 35
 Defense counsel objected to the question and moved for a mistrial, arguing that this was the ultimate question for the jury to decide. The court overruled the motion, noting that the agent had developed an expertise on the matter. Garcia was permitted to answer "yes" to the question.
 
 
 36
 A witness may not give a direct opinion on a defendant's guilt. See Cooper v. Sowders, 837 F.2d 284, 286-87 (6th Cir.1988). Although the question, whether defendant appeared to be a drug dealer, came close to expressing such an opinion, the testimony at issue comprised only two pages of a multi-volume transcript of a month-long trial, and the issue was never brought up again. Any error was harmless in view of the extensive evidence from numerous sources of defendant's guilt.
 
 K. Rule 404(b) Evidence
 
 37
 Defendant also insists that the district court erred by admitting evidence of prior bad acts under Fed.R.Evid. 404(b) ("Other crimes, wrongs, or acts"). This argument lacks merit because the testimony he refers to was not prior acts evidence.
 
 
 38
 At trial, a Columbus police detective testified about a time he arrested defendant for carrying a concealed weapon. On cross-examination, defense counsel asked the detective how he had met defendant, and the detective responded that he had met him in 1984 while investigating a homicide at an after-hours bar in which defendant had an interest.
 
 
 39
 On redirect examination by the government, the following exchange took place:
 
 
 40
 Q. During the 11 years you spent on homocide (sic), have there been a number of killings in these after-hours bars?
 
 
 41
 A. Yes, sir.
 
 
 42
 Q. Are they usually related to money or drinking or something like that?
 
 
 43
 Defense counsel objected at that point and requested a mistrial. The court overruled the mistrial motion.
 
 
 44
 The government's question about "a number of killings" was not any reference to a past bad act of defendant under Rule 404(b). Furthermore, while it might have been prejudicial had the government first brought up the issue of a homicide at an after-hours bar with which defendant was associated, here, the defense itself interjected the issue of how the detective and defendant first met after no allusions to that initial meeting by the government. Under those circumstances, the court did not err in rejecting the request for a mistrial.
 
 L. Jury Misconduct
 
 45
 Defendant relies upon two incidents of alleged jury misconduct to urge that the district court erred in refusing to declare a mistrial. In the first, marshals informed counsel that during a break, a Columbus police officer had resumed his place in the witness chair and exchanged some words with a juror.
 
 
 46
 The district court confirmed this report by interviewing the marshall in chambers. The court then questioned the jurors one by one. The juror who spoke with the officer explained, "We had been sitting there for quite a while and he looked over and he said something to the effect that he was falling asleep or something. And I said, we have been doing this for a week and a half. And I think that was all that was said." The juror denied that the remark would have any effect on his decision in the case.
 
 
 47
 At least three jurors testified they had heard the two talking. One juror referred to the conversation as "[j]ust smiling and just small kibitzing is all basically." All jurors responded that they would still be able to view the case objectively. Defense counsel moved for a mistrial, suggesting the reference to "smiling and kibitzing" showed that the jurors had an enhanced rapport with the government because of the exchange. The court ruled that the exchange was insignificant and did not prejudice defendant, and denied the motion for mistrial.
 
 
 48
 The second instance was near the end of the trial. The last alternate juror informed the district judge's law clerk that he had heard another juror jokingly mention in passing that he had made up his mind on the case. The court questioned the alternate juror who reported the conversation as well as the juror who allegedly made the remark, Mr. Masters. Mr. Masters denied that he made the comment and insisted that he had not made up his mind.
 
 
 49
 Defense counsel moved to strike Mr. Masters or for a mistrial. The government suggested striking both jurors, and defense counsel agreed. The court accordingly struck both jurors from the panel, replacing them with two alternates. Defense counsel noted his opposition to questioning any other jurors about the incident, so there was no further inquiry.
 
 
 50
 Although defendant argues that prejudice is presumed from any communications with the jury, that is no longer the law. In Remmer v. United States, 347 U.S. 227, 229 (1954), the Supreme Court held that in a criminal case, any private communications with jurors were presumptively prejudicial and the government bore a heavy burden to establish the contact was harmless.
 
 
 51
 However, in Smith v. Phillips, 455 U.S. 209, 215-16 (1982), the Supreme Court backed away from this holding and indicated that it is the defendant's burden to prove actual bias. This court has examined Remmer and Phillips and held that, "[i]n light of Phillips, the burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality. Prejudice is not to be presumed." United States v. Pennell, 737 F.2d 521, 532 (6th Cir.1984), cert. denied, 469 U.S. 1158 (1985). The cases on communications with jurors make four essential points:
 
 
 52
 (1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held;
 
 
 53
 (2) no presumption of prejudice arises from such a contact;
 
 
 54
 (3) the defendant bears the burden of proving actual juror bias; and
 
 
 55
 (4) juror testimony at the "Remmer hearing" is not inherently suspect.
 
 
 56
 United States v. Zelinka, 862 F.2d 92, 95-96 (6th Cir.1988). The district court's ruling after holding a Remmer hearing is reviewed for abuse of discretion. Pennell, 737 F.2d at 533.
 
 
 57
 It is clear that the district court conformed to these procedures after it heard of the officer's comments to the jurors. The court interviewed each juror alone, and each assured the judge that the conversation would not affect his or her ability to decide the case objectively. This testimony is not suspect. Moreover, defendant claims actual bias by the jury only as an afterthought, and he makes no attempt to prove or specify that bias. The court therefore did not abuse its discretion in refusing to grant a mistrial.
 
 
 58
 As to the dismissal of Mr. Masters and the juror who reported his alleged comment, defense counsel specifically agreed to the solution the district court employed. In addition, defense counsel objected to the court's discussing the episode with any other jurors and so cannot now complain that the remaining jurors may have been affected by Masters' remark.
 
 M. Propriety of Electronic Interception
 
 59
 Defendant argues that because the agents did not apply for an electronic surveillance warrant, Agent Garcia's taping of his transaction with defendant violated Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-21. This argument is frivolous because the Act clearly permits electronic monitoring without a warrant when one participant to the conversation gives consent. 18 U.S.C. § 2511(2)(c).
 
 III.
 
 60
 Defendant's conviction and sentence are affirmed.
 
 
 
 *
 The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 That rule provides, in relevant part that "[a]t least 10 days before imposing sentence, ... the court shall provide the defendant and the defendant's counsel with a copy of the report of the presentence investigation.... The court shall afford the defendant ... an opportunity to comment on the report...." Fed.R.Crim.P. 32(c)(3)(A)
 
 
 [2]
 18 U.S.C. § 924(c)(1) provides:
 Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years.... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried....