### UNITED STATES of America

v.

### Tera DANIELS, Lawrence Orlando, Sr. and Tera's Enterprises, Inc.

#### No. 3:98–00160.

United States District Court, M.D. Tennessee, Nashville Division.

July 28, 2000.

Jimmie Lynn Ramsaur, Nashville, TN, for plaintiff.

Charles Ray, Edward Gross, Jennifer Thompson, Nashville, TN, for defendant.

### *MEMORANDUM*

CAMPBELL, District Judge.

Pending before the Court are Defendants' Motions for New Trial (Docket Nos. 515–518) and the Government's Response. For the reasons described herein, the Motions are DENIED.

### I. *Background*

On May 1, 2000, trial commenced against Defendants Tera Daniels, Lawrence Orlando, Sr., and Tera's Enterprises, Inc. Defendants were indicted for violating the Travel Act, laundering money, conspiracy, and aiding and abetting.[1]

A jury of twelve was seated: Corine Harris, Amy Wilson, Kim Wade, Dorothy Semich, Barbara Horton, Lou Jefferson, Paula Schuman, Steven Fielder, John Car-

---

1. The Indictment charged the following crimes. Count 1: conspiracy-Travel Act; Count 2: conspiracy-money laundering; Counts 3–10: Travel Act; Counts 11–24: money laundering; Counts 25–30: Travel Act;

Counts 31–34: money laundering; Count 35: unlawful monetary transactions; and Count 36: forfeiture. Aiding and abetting charges also applied to Counts 3 to 35. Not all the Counts applied to each of the Defendants.

ver, Joseph ("Mike") Martin (foreperson), Julie Pinkerton, and Paul Smith.

Three alternate jurors were also selected: Dennis Tillman, Rellis Clements, and Robert Springer. The alternate jurors were dismissed after the jury was charged and prior to the commencement of jury deliberations.

On Wednesday, May 17, 2000, the jury found the Defendants guilty of the following Counts of the Indictment: Tera Daniels—Counts 1 to 35; Lawrence Orlando—Counts 1 and 2; and Tera's Enterprises, Inc.—Counts 1 to 34. (Docket Nos. 427–429). In summary, Defendants Tera Daniels and Tera's Enterprises, Inc. were convicted on all Counts charged, while Defendant Orlando was convicted only of conspiracy to violate the Travel Act and conspiracy to launder money.

2. The Special Verdict Form for the forfeiture phase is incorrectly dated "5–17–2000." The forfeiture verdict was taken by the Court on May 18, 2000. (Docket No. 513, p. 58).

3. The May 18, 2000 article reads as follows:

Tera M. Daniels, who owned and operated Dawn's Whirlpool and Health Spa on Eighth Avenue South, was convicted yesterday of 35 counts of prostitution-related racketeering, money laundering and conspiracy.

A U.S. District Court jury found Daniels, 41, guilty of all the charges that prosecutors presented against her—despite her claim that she did not know the women she employed offered customers sex for money from 1993–99.

There was testimony during the 12–day trial that Daniels had installed an automated teller machine at the business after federal authorities let her know they were investigating credit card receipts issued to her customers.

Several customers described the sex acts they were offered at Dawn's, and one testified he went there for sex about 300 times.

The jury also convicted Daniels' on-again, off-again boyfriend, Lawrence Orlando, 52, of conspiring to commit racketeering and money laundering, but acquitted him of 16 specific charges of racketeering and money laundering.

Tera's Enterprises Inc., a corporation that Daniels owned, was convicted of 34

The jury was polled and unanimously confirmed the verdicts in open Court without hesitation. (Docket No. 513, pp. 10–11).

After these verdicts were rendered, trial proceeded on Count 36, which sought forfeiture of certain property from Defendant Tera Daniels. The jury proceeded to deliberate on that same day, but did not reach a verdict. The next day, Thursday, May 18, 2000, the jury returned a verdict of forfeiture of Defendant Daniels' property. (Docket No. 431).[2]

Again, the jury was polled and unanimously confirmed the forfeiture verdict in open Court without hesitation. (Docket No. 513, pp. 58–60).

Also on the morning of May 18, 2000, an article about this case appeared in The Tennessean newspaper titled "Ex-owner of spa guilty of prostitution charges."[3]

counts of racketeering and money laundering.

Six employees of Dawn's had earlier pleaded guilty to racketeering or money laundering charges or both. They included Daniels' mother, Joan M. Gould, who worked as her bookkeeper, and her stepbrother, David Minnick Sr., who was the general manager at Dawn's.

Daniels was taken into federal custody in August. She walked away from a Nashville halfway house late in December and fled to Texas with her twin 9–year–old daughters.

Federal marshals arrested her in a hotel room in Houston Jan. 12.

Daniels kissed her daughters after the guilty verdicts were announced late yesterday afternoon.

Judge Todd Campbell set a sentencing hearing for Daniel and Orlando on July 31.

He allowed Orlando to remain on a form of house arrest, leaving home only to go to work at Orlando's Speed Shop, his design and body shop for race cars on Fourth Avenue South. Orlando is a former champion weight lifter who worked on the Vanderbilt University football program's strength development team in the 1980s.

All but one of the 35 counts against Daniels carry maximum sentences of 20 years each. The remaining count has a maximum sentence of five years in prison.

But lawyers involved in the case said Daniels was not likely to receive a sentence of more than 20 years.

Orlando is subject to a prison sentence of up to 20 years.

(Docket No. 491, Ex. 1).[4]

On May 22, 2000, Defendant Orlando filed a Motion (Docket No. 433) stating that Orlando had "received a telephone call" from Juror Kim Wade. The Motion asserts that, based on "the conversation" with Wade, the verdict as to Orlando "may not have been unanimous; may not have been decided based on the evidence that was presented in the courtroom; and may have been influenced by newspaper publicity." (*Id.*)

On May 26, 2000, the Court held a hearing on the Motion (Docket No. 496). Defendant Orlando testified about two continuous telephone calls, that took place on Thursday May 18, 2000, during which he spoke with Juror Kim Wade. According to Defendant Orlando, Wade initiated the telephone calls, which lasted about two hours. (Docket No. 496, pp. 6, 8). Defendant Orlando's handwritten notes (Docket No. 443, Ex. 3) of the telephone calls and a summary thereof (Docket No. 443, Ex. 1) were admitted into evidence.[5]

At the conclusion of Defendant Orlando's testimony, the Court scheduled a hearing to consider testimony from Juror Wade about the alleged extraneous influences on the jury, specifically, "newspaper articles" and "people who run the jury system saying there had to be a unanimous verdict." (Docket No. 496, pp. 32–33). The Court determined that matters

> After Daniels was convicted, prosecutors Jimmie Lynn Ramsaur and Hilliard Hester asked the jury to find that Daniels should forfeit $745,000 and her home on Lakeview Circle in Mt. Juliet to the federal government.
> But Daniels' lawyer, Charles Ray, told the jury, 'My client is penniless. She is going to pay her debt to society. But the government wants a judgment of $745,000 waiting on her when she comes back .. When does enough become enough?'
> The jury deliberated for about two hours on the forfeiture question before announcing it was deadlocked on the question.
> Campbell sent the jurors home for the night at 6:40 p.m. and told them to resume deliberations this morning on whether Daniels should have to forfeit her home.

prohibited by Fed.R.Evid. 606(b) would be excluded from the hearing.

## II. *Juror Wade's Testimony*

On May 30, 2000, the Court heard testimony from Juror Wade about the following alleged extraneous influences on the jury:

### 1. *The Tennessean* newspaper articles

(a) Two newspaper articles about the case were brought in by "another juror" and read by several jurors in the restroom on the last day of forfeiture deliberations (Docket No. 465, pp. 4–5, 13–14, 22); Wade stated that she did not read the newspaper articles (Docket No. 465, pp. 36–37);

(b) Juror Martin followed and discussed newspaper articles with jurors (Docket No. 465, pp. 4–6);

(c) Jurors read and discussed newspaper articles (Docket No. 465, pp. 13–14, 37), which made the jury look "dumb" and "stupid" (Docket No. 465, p. 26);

### 2. The Chamber

(a) Juror Martin told jurors that the Chamber was located next to Dawn's (Docket No. 465, pp. 6, 10);

(b) Juror Martin told jurors to look up the Chamber in the telephone book (Docket No. 465, pp. 10–11);

(Docket No. 491, Ex. 1).

4. Other articles were also published in *The Tennessean* over the course of the case. *See* Docket No. 486, Ex. 1 for copies of articles published on the following dates: Saturday, 11/20/99; Friday, 1/14/00; Tuesday, 4/18/00; Wednesday, 5/17/00; Thursday, 5/18/00; Friday, 5/19/00; and Thursday, 6/1/00. *See also* Docket No. 443, Ex. 4 for certain duplicate copies.

5. Other purported handwritten notes of the telephone calls allegedly taken by "Larry Loftin" or "Larry Loftis" were marked for identification but not received into evidence. (Docket No. 443, Ex. 2; Docket No. 496, pp. 10–11, 14).

### 3. Police Statements

(a) Juror Martin told jurors that police officers said they knew there was more going on at Dawn's than massages (Docket No. 465, p. 9);

### 4. Miscellaneous Matters Not Admitted In Evidence

(a) Juror Martin told jurors:

(i) Names of clients who visited Dawn's (Docket No. 465, p. 7);

(ii) Defendant Orlando was on house arrest (Docket No. 465, p. 8);

(iii) Defendant Tera Daniels owned Cathy's, Hermitage, Above–It–All, and the Chamber (Docket No. 465, pp. 9–10);

(iv) Defendant Tera Daniels had trouble with Cleopatra's and had testified regarding it (Docket No. 465, p. 27);

(v) Someone Juror Martin knew said that Defendant Orlando was always at the race track or speed shop (Docket No. 465, pp. 33, 52);

### 5. Television News—"Sin City"

(a) "A lot" of jurors watched and discussed the "Sin City" series that ran on Channel 5 television news during the trial (Docket No. 465, pp. 11–13, 39);

### 6. Jury Verdict Preferred

(a) A jury administrator, Trish Higgins, told a juror who had a dental appointment that it would be best and preferred for the jury to reach a decision (Docket No. 465, pp. 15–16, 23–24, 40);

### 7. Dr. Richard Feldman

(a) Three to four jurors had been patients of Dr. Richard Feldman and discussed his money-making business schemes (Docket No. 465, pp. 14–15);

### 8. *The Tennessean* Website

(a) Juror Wade was told by other jurors to go to *The Tennessean* website to look up previous articles on the case (Docket No. 465, pp. 36, 42–43, 50);

(b) Some of the jurors looked up articles on *The Tennessean* website (Docket No. 465, pp. 36, 42–43), including one article relating to the grand jury proceedings in the case (Docket No. 465, p. 42).

(c) Juror Wade stated that she did not visit *The Tennessean* website (Docket No. 465, p. 50) but Jurors Martin, and maybe Pinkerton and Wilson, did so (Docket No. 465, p. 53);

### 9. Jury–Out Hearings

(a) Juror Martin said a friend told him that when the jury left the courtroom, Charles Ray, counsel for Defendant Tera Daniels, was constantly trying to get a mistrial over "Sin City," the incarceration of Defendant Daniels, and other matters that the jury was not supposed to know (Docket No. 465, pp. 44–46);

(b) Juror Martin learned about the mistrial requests from parties he attended "almost every night" (Docket No. 465, pp. 20, 27, 28, 46–47).[6]

As indicated above, Wade particularly focused on the alleged misconduct of jury foreperson Martin.

Wade also testified that none of the alleged extraneous matters affected her personal verdict on Defendants Tera Daniels or Tera's Enterprises, Inc. (Docket No. 465, pp. 29–31, 51). However, Wade testified that the purported extraneous matters influenced her to further doubt Defendant Orlando's guilt (Docket No. 465, pp. 32–35, 51–53).

The Defendants subsequently filed motions for *Remmer*[7] hearings (Docket Nos.

---

**6.** Wade also testified that prior to deliberations, and contrary to the Court's orders to the jury, Juror Martin discussed the case at daily lunches with Jurors Wade and Pinkerton (Docket No. 465, p. 18); and jurors commented and joked about the "30 minute man"

testimony (Docket No. 465, p. 26). Juror Wade alleged that a juror told Martin that they were not supposed to be talking about the case (Docket No. 465, pp. 8, 25).

**7.** *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

468, 469, 475, and 476). The Government filed responses to the motions (Docket Nos. 442 and 477). The Court then ordered (Docket No. 480) another hearing to consider testimony from Juror Martin.

Meanwhile, on June 1, 2000, *The Tennessean* published an article about Juror Wade's testimony at the May 30, 2000 hearing. (Docket No. 486, Ex. 1)

### III. *Juror Martin's Testimony*

On June 23, 2000, the Court heard testimony from Juror Martin (Docket No. 502). Martin generally denied or claimed no knowledge of the various allegations made by Wade. (Docket No. 502). Martin's testimony put the credibility of Wade, as well as his own credibility, directly at issue. (Docket No. 501, pp. 32–33 and Docket No. 502, pp. 47–48, 56).

Martin denied that there were any extraneous or external influences on the jury. (Docket No. 502, p. 26). Martin denied or had no knowledge of Wade's allegations regarding *The Tennessean* newspaper articles. (Docket No. 502, pp. 9–10, 22, 25). Martin acknowledged that on the last day of deliberations, a juror in the jury assembly room mentioned the existence of a newspaper article but not its contents. (Docket No. 502, pp. 9–10).

Martin denied the "Chamber" allegations made by Wade. (Docket No. 502, pp. 9, 20). Martin stated that it was a "lie" that he told jurors to look up the Chamber in the telephone book. (Docket No. 502, p. 20). Martin strongly denied as an "outright lie" Wade's claims that he discussed the case with police officers. (Docket No. 502, pp. 12, 16, 18, 20, 26). Martin stated that Wade's testimony that Martin learned that Defendant Orlando was always at the race track or the speed shop was an "untruth." (Docket No. 502, pp. 28–29).

Regarding "Sin City," Martin recalled a juror speculating that the Court had reiterated its instruction about avoiding the

media because "Sin City" was to be broadcast. (Docket No. 502, pp. 13, 27–28). Martin did not recall any statements from the jury administrator, Trish Higgins, about reaching a verdict (Docket No. 502, p. 13). The only juror Martin knew that may have been a client of Dr. Feldman's was Wade. (Docket No. 502, p. 15).[8]

Martin denied telling jurors that they could look up articles on *The Tennessean* website. (Docket No. 502, p. 21). He acknowledged that he overheard jurors saying that if there were ever articles in the newspaper they could be researched on the website, but not that any juror had done so. (Docket No. 502, pp. 12–13, 21).

Martin denied that he obtained or communicated information from jury-out hearings to jurors (Docket No. 502, p. 19), and denied that he went to parties almost every night, as alleged by Wade. (Docket No. 502, p. 24).

Martin further testified that after the trial, Wade had called him and told him that Defendant Orlando had contacted her, that she was scared, and that Wade and Orlando talked for about five minutes. (Docket No. 502, pp. 16–17, 31–32, 34, 37). Martin testified that he then called General Sessions Judge Gale Robinson for Wade to determine if Orlando's call to Wade was improper. (Docket No. 502, p. 17).

According to Martin, after Wade testified in Court, she called Martin to tell him about the hearing and suggested that Juror Corine Harris may have provided information about Martin for the hearing. (Docket No. 502, pp. 33–34, 38–39, 45). After *The Tennessean* newspaper article about Wade's testimony appeared, Wade called Martin and said that the newspaper article contained a "bunch of lies" and that she was going to call the newspaper and the judge to straighten the matter out. (Docket No. 502, p. 35).

---

8. Martin did not recall being admonished by another juror not to talk about the case (Docket No. 502, p. 40). Martin acknowledged that a juror jokingly commented about the "30 minute man." (Docket No. 502, pp. 11–12).

At the conclusion of Martin's testimony, the Court ordered (Docket No. 485) further hearings to consider testimony from all the remaining jurors and alternate jurors regarding the alleged extraneous influences on the jury.

To accommodate jurors' schedules, hearings were held on June 27, 2000 (Docket No. 497) for Jurors Barbara Horton and Paul Smith; on June 30, 2000 (Docket No. 497) for Jurors Corine Harris, Dorothy Semich, Lou Jefferson, Paula Schuman, Dennis Tillman (Alternate), Steven Fielder, John Carver, Julie Pinkerton, Rellis Clements (Alternate) and Robert Springer (Alternate); and on July 7, 2000 (Docket No. 501) for Juror Amy Wilson.

On June 30, 2000, the Court issued an Order (Docket No. 493) granting the Government's Motion (Docket No. 489) to subpoena certain telephone records of Juror Wade and Defendant Orlando. Telephone records from BellSouth were filed at the July 7, 2000 hearing (Docket No. 499, Ex. 2).

The BellSouth records show that the Wade (615–662–9656) and Orlando (615–742–9007) exchanges called each other six times between May 18, 2000 at 3:57 p.m. (15:57) and May 19, 2000 at 1:57 a.m. (1:57) for a total of over seven (7) hours (441 minutes). The Wade exchange placed the first four calls while the Orlando exchange placed the next two calls.[9] (Docket No. 499, Ex. 2).

On July 12, 2000, the Court heard testimony from Margaret Martin, the wife of Juror Joseph Martin. (Docket No. 512).

### IV. *Other Testimony*

At the hearings, Juror Barbara Horton testified and did not corroborate Wade's assertions. (Docket No. 497, pp. 5–18).

Juror Paul Smith confirmed that a juror brought in a newspaper article, but identified Kim Wade as the culprit. (Docket No. 497, pp. 20–24, 28, 34–35). Smith stated Wade brought a newspaper article about the guilty verdict into the jury assembly room on the last day of deliberations and that he did not see anyone read it or discuss it. (Docket No. 497, pp. 21–22). Smith testified that he heard Wade talking about "Sin City" with jurors. (Docket No. 497, p. 23).[10]

Juror Corine Harris testified that Wade told her, after the trial, that Orlando had called Wade (Docket No. 497, pp. 50, 59, 61) and that Orlando noticed what Wade wore during the trial and admired her. (Docket No. 497, p. 60).

Juror Dorothy Semich testified that a juror brought in a newspaper article on the last day that talked about the guilty verdict reached the previous day. (Docket No. 497, pp. 65, 78–79). She read the newspaper article, but it did not impact her decision on forfeiture. (Docket No. 497, p. 79). She watched part of "Sin City" one night, and heard jurors talk about it regarding an adult bookstore. (Docket No. 497, p. 67). During a jury-out hearing, jurors commented on wanting to catch the "whole picture," but no facts were provided. (Docket No. 497, p. 73).

Juror Lou Jefferson testified that on the last day of deliberations she saw Kim Wade with a folded newspaper article. (Docket No. 497, pp. 94–95, 101).

Juror Paula Schuman testified that she brought in a newspaper article, on the last day of deliberations, about the guilty verdicts rendered the previous day. (Docket No. 497, pp. 109, 122). According to Schuman, Wade and Jefferson read the article but it was not discussed among the jurors. (Docket No. 497, pp. 110, 120, 123). Schu-

---

**9.** Local Rule 12(h) provides, in pertinent part, that: "No attorney, party, or representative of either may interrogate a juror after the verdict has been returned without prior approval of the Court." Defendant Orlando had no such approval.

**10.** Smith testified that Martin and others were admonished by three jurors for talking about the "30 minute man." (Docket No. 497, pp. 32, 35).

man characterized bringing in the article as "stupid" (Docket No. 497, pp. 109, 118), but "there was nothing in the article that we didn't already know." (Docket No. 497, p. 118). Schuman testified that Semich told her during a telephone conversation after the trial, that the later article about the Wade hearing made the jurors look stupid. (Docket No. 497, pp. 121, 123). Schuman testified that she heard some jurors talking about "Sin City" during the trial (Docket No. 497, pp. 111, 115).

Alternate Juror Dennis Tillman testified but did not corroborate Wade's assertions. (Docket No. 497, pp. 129–132).

Juror Steven Fielder testified that Juror Martin mentioned knowing policemen and lawyers. (Docket No. 497, pp. 123, 136). Fielder also gave ambiguous testimony about two jurors talking about "Sin City." (Docket No. 497, pp. 133, 139).

Juror John Carver's testimony did not corroborate Wade's assertions. (Docket No. 497, pp. 142–144).

Juror Julie Pinkerton denied that the case was discussed at lunches with Jurors Martin and Wade, other than humorous comments, such as the "30 minute man." (Docket No. 497, pp. 146–147, 161). Pinkerton specifically denied that Martin mentioned knowing police, judges or attorneys who gave him information about the case. (Docket No. 497, pp. 147, 156–157). Pinkerton also testified that Wade mentioned *The Tennessean* website. (Docket No. 497, pp. 148–149, 159). Pinkerton recalled that a juror ("Paula") brought in a newspaper article and Wade read it. (Docket No. 497, p. 161).

According to Pinkerton, after the trial, Wade told Pinkerton that Defendant Orlando had called Wade, that she was scared, and that the call lasted about five minutes. (Docket No. 497, pp. 150, 168–169). Pinkerton testified that Wade also told her that Orlando said "he hoped she wasn't offended that he watched her a lot during the trial; that he complemented her on her attire and to quote her, her big titties. Her big titties were like Tera's." (Docket No. 497, pp. 170–171). Pinkerton testified that she suggested to Wade that Wade get a retraction from the newspaper because the article about her testimony said Wade called Orlando, and that Wade responded: "I think I will do that." (Docket No. 497, pp. 150, 171). Pinkerton testified that she and Martin discussed the conflict between Wade's statements to them and the newspaper article as to who placed the Wade–Orlando telephone call. (Docket No. 497, pp. 154, 158, 163, 165).

In summary, Juror Pinkerton generally corroborated Martin's version of events and contradicted Wade's testimony.

Alternate Juror Rellis Clements testified that Martin did not discuss the case with her, Wade and Pinkerton at the two lunches she attended with them. (Docket No. 497, p. 175).

Alternate Juror Robert Springer testified that he heard jurors mention that "Sin City" was on television. (Docket No. 497, p. 180). Springer heard Martin "say something" about he knew policemen but "I don't know if he was talking about the case or not." (Docket No. 497, pp. 181–182, 189). He further testified there was an "innuendo" that "there is probably some things going on down there that from, I guess, a third party he could confirm or he knew of." (Docket No. 497, pp. 182–185, 189). It was no "longer than a five second sentence." (Docket No. 497, p. 184). He did not hear Martin say what did go on at Dawn's. (Docket No. 497, p. 189). Springer heard a juror admonished by another juror for talking about the case prior to deliberations. (Docket No. 497, pp. 186–187, 190).

Juror Amy Wilson testified that she recalled Martin having mentioned that he knew police officers but not regarding the case. (Docket No. 501, pp. 11–12). She said that a juror mentioned that Dawn's was not on "Sin City." (Docket No. 501, pp. 14–15). She also testified that Wade e-mailed her after the trial and stated that

she was upset and that the jury was being accused of misconduct. (Docket No. 501, pp. 6–7, 19–20).

Finally, Margaret Martin, the wife of Juror Martin, testified that, after the trial, "Kim" called and asked to speak to Mr. Martin because "a guy by the name of Big O called her on the telephone and spoke to her and she didn't know if that was appropriate." (Docket No. 512, p. 4). Mr. Martin returned Wade's call, then called Judge Gale Robinson, and then called Wade back. (Docket No. 512, pp. 5–6). According to Ms. Martin, at a party at her house after the trial, Wade joked that "Big O had said when she sat in the stands that she looked nice and he wouldn't think she would go against him and ... that her breasts reminded him of the way that Tera's used to remind him years ago. That was the joke, her breasts were the big joke." (Docket No. 512, p. 8). Ms. Martin stated that Wade telephoned again about having to testify ·and asked if Mr. Martin had also received a subpoena to testify. (Docket No. 512, pp. 13–14).

## V. *Discussion*

After the conclusion of the *Remmer* hearings, the Defendants filed the pending Motions for New Trial. Defendants contend that they are entitled to a new trial because the jurors were subjected to extraneous influences that invalidated their verdict. In *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), the Supreme Court described the procedure the district court should follow

when advised of an unauthorized communication with a juror:

> The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.[11]

In a subsequent decision, the Court reaffirmed use of the procedure set forth in *Remmer*, but also stated: "This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

The Sixth Circuit has interpreted these decisions as imposing the burden of showing bias on the defendant. *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984). The *Pennell* court specifically held when a defendant alleges unauthorized contact with a juror has tainted a trial, a hearing must be held; juror testimony at the *"Remmer* hearing" is not inherently suspect; the defendant must show that the unauthorized communication resulted in actual juror impartiality; and prejudice to the defendant is not to be presumed. 737 F.2d at 532–34. *See also United States v. Davis*, 177 F.3d 552, 557 (6th Cir.1999); *United States v. Herndon*, 156 F.3d 629, 636 (6th Cir.1998); *United States v. Frost*, 125 F.3d 346, 377–78 (6th Cir.1997); *United States v. Zelinka*, 862 F.2d 92, 95–96, (6th Cir.1988).[12]

---

**11.** At the *Remmer* hearings held in this case, the Court was guided by Rule 606(b) of the Federal Rules of Evidence, which describes the relevant parameters in questioning jurors about their experience during the trial:

> (b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concern-

ing the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

**12.** Defendants point out that other circuits disagree with the Sixth Circuit and hold that

The Court concludes that the *Remmer* hearings in this case have not revealed juror exposure to any extraneous information that prejudiced the Defendants. Although Juror Wade made several allegations of juror exposure to extraneous prejudicial information, a review of all the testimony adduced at the *Remmer* hearings indicates that the allegations either lack credibility; or that no prejudice to Defendants resulted from juror exposure to extraneous information. The Court notes that, aside from Juror Wade, no other juror expressed any doubt about their verdicts in this case.

As for Juror Wade's credibility, much of her testimony was contradicted by the testimony of other witnesses and evidence. For example, Wade did not disclose during her testimony that she had participated in multiple telephone conversations with Defendant Orlando, lasting over seven hours, as shown by the telephone records; or that the two discussed her physical attractiveness to the Defendant, as Wade told Jurors Pinkerton and Harris, and Mrs. Martin. Wade testified that she did not read the newspaper article allegedly brought into the jury room, but Jurors Smith, Jefferson, Schuman, and Pinkerton testified that they saw Wade either reading or holding the article. Wade testified that another juror suggested looking up articles on the website for *The Tennessean*, but Pinkerton testified that Wade told others about the website.

Wade also contradicted her own testimony in statements she made to other jurors. For example, Wade testified that she called the Defendant, which appears to have been the case, but told Jurors Harris, Pinkerton, Martin, and Mrs. Martin that the Defendant called her. Wade told Martin and Pinkerton that the newspaper article describing her allegations of jury misconduct was a lie, and falsely suggested that Juror Harris was the source of the allegations of juror misconduct that led the Court to hold hearings to investigate the allegations.

In addition to these objective indications that Wade's testimony lacks credibility, the Court's observation of the bearing, demeanor, and deportment of Wade, and all the other witnesses who testified at the *Remmer* hearings, leads the Court to credit the testimony of the other witnesses. The Court specifically credits the testimony of Jurors Martin and Pinkerton in denying the allegations of misconduct by Martin.[13]

As for Wade's specific allegations, most lack corroboration. No juror corroborated Wade's allegation about the Chamber, *i.e.* that Martin told jurors that they could find the address for the Chamber in the telephone book. In any event, neither Wade nor the other jurors suggested that they were aware that sadomasochistic sexual acts occurred at that location, which was the basis for the Court's decision to exclude references to the Chamber during the trial.

There was no corroboration for Wade's allegation that Martin stated that he had been told that Defendant Orlando was always at the race track or his speed shop, and not at Dawn's Whirlpool, or that Defendant Orlando was on house arrest. There was also no corroboration that Martin told jurors names of clients who visited Dawn's Whirlpool.

No juror corroborated Wade's allegation that Martin told jury members what occurred during jury-out hearings.

---

extraneous information is presumptively prejudicial. *See, e.g., United States v. Hornung*, 848 F.2d 1040, 1044 (10th Cir.1988); *United States v. Butler*, 822 F.2d 1191, 1195 n. 2 (D.C.Cir.1987). Even if the Court were to apply a presumption of prejudice in this case, however, that presumption has been rebutted as indicated by the discussion below.

**13.** For these same reasons, the Court disagrees with Defendants' assertion, citing *United States v. Walls*, 162 F.3d 1162 (Table), 1998 WL 552907 (6th Cir. Aug.11, 1998), that the jurors' testimony, except that of Wade, is inherently suspect.

No juror corroborated Wade's allegation that Trish Higgins, a jury administrator, told jurors they should reach a decision.

No juror corroborated Wade's allegation that certain jurors claimed Dr. Richard Feldman had been their physician, or discussed his money-making business schemes. The evidence indicates that only Wade had mentioned having been a patient of Dr. Feldman.

No juror corroborated Wade's allegation that jurors had accessed articles about the case on the *The Tennessean* website. The evidence indicates that Wade mentioned the website, but no juror actually accessed the website.

No juror corroborated Wade's allegation that Martin obtained extraneous information about Dawn's Whirlpool from police officers and conveyed it to the other jurors.[14] The evidence indicates only that Martin mentioned knowing some policemen.

As for Wade's allegations about newspaper articles and the television series "Sin City," the evidence confirmed those allegations in a very limited way. Although Juror Semich testified that she viewed a portion of one segment of the television series, and there was mention of the series in the jury room, there was no evidence that Dawn's Whirlpool was mentioned in the series, or that any facts relevant to this case were revealed on the series. Therefore, Defendants have failed to show how they were prejudiced by any exposure to the series by the jurors.

Wade's allegations about newspaper articles was corroborated in a limited way— Juror Schuman admitted bringing in the article quoted in Footnote 3 on the last day of deliberations. Jurors Wade, Semich, and Jefferson may have read the article but it was not discussed among the jurors. Although the article potentially could have provided prejudicial extraneous information to the jurors, the Court agrees with Schuman's assessment that there was nothing in the article the jurors did not already know. The article discussed the verdicts rendered by the jury the previous day as to the three Defendants, and recounted certain testimony given during the trial. The article also stated that the Government was seeking forfeiture of certain of Defendant Daniels' property, that the jury had deliberated on the forfeiture issue for two hours before announcing it was deadlocked, and that the Court had sent the jurors home and told them to continue deliberations the next morning.

Clearly, the article could not have affected the jury's guilt/innocence verdicts as to the three Defendants as those verdicts had already been rendered and announced. As for the forfeiture decision, there was simply nothing in the article that would prejudice the jury's deliberations on that issue. *See United States v. Williams–Davis*, 90 F.3d 490, 499–502 (D.C.Cir.1996)(Jury exposure to newspaper articles merely duplicative of evidence already introduced at trial does not result in prejudice rendering verdict invalid.) Moreover, neither Orlando nor Tera's Enterprises, Inc. were the subject of the forfeiture count.

Wade's motives are not entirely clear, but at a minimum, involve unwarranted second thoughts about Defendant Orlando's guilt. The Court also finds Wade's interest in speaking to Orlando at length until the wee hours of the morning to be uncharacteristically exuberant for a juror.

14. The only hint of corroboration came from Alternate Juror Springer's testimony that he heard Martin say something about knowing policemen, and an "innuendo" that a third party could confirm what went on at Dawn's. This testimony is simply too vague to support Wade's allegation that Martin stated he *had* spoken to police officers, and *had been told* that prostitution occurred at Dawn's. At most, this testimony indicates that Martin said he knew police officers who likely would be able to confirm whether prostitution occurred at Dawn's. Stating that the police would likely have certain information, however, is not the same as obtaining such extraneous information and revealing it to other jury members.

The Court finds that Wade's allegations of extraneous information lack credibility. At best, Wade exaggerated and embellished certain harmless, non-prejudicial conduct by other jurors or herself. At worst, Wade's allegations are fanciful and completely unfounded.

In conclusion, the *Remmer* hearings in this case did not reveal that Defendants were actually prejudiced by any extraneous information to which jurors may have been exposed.

### VI. *Conclusion*

For the reasons described above, the Defendants' Motions (Docket Nos. 515–518) are DENIED.

IT IS SO ORDERED.